THE STATE *ex rel.* BROWN, *Prosecuting Attorney,* v.
McMILLAN *et al.*

DIVISION TWO.

1. **Quo Warranto:** PROSECUTING ATTORNEY : RELATOR. A prosecut-
ing attorney may maintain a *quo warranto* proceeding without the
intervention of a private person as a relator.

2. **Office, Vacancy In.** An office becomes vacant *ipso facto* by its
creation.

3. **Australian Ballot:** CITIES OF FOURTH CLASS. The Australian
ballot system (R. S. 1889, chap. 60, art. 3, and Laws, 1891, p. 136)
applies to aldermen of cities of the fourth class, and an election not
held in accordance therewith is invalid.

4. ———: CONSTITUTION. The Australian ballot system is constitu-
tional.

*Quo Warranto.*

DEMURRER OVERRULED.

*Marcy K. Brown* and *Wash. Adams* for relator.

(1) There were no vacancies in the new wards
such as there was any authority under the law to fill,

and, hence, the special election was void. The Australian ballot law by the amendment of 1891 was extended so as to apply to every voting precinct in the state and to all elections, except those expressly excluded. Hence, the special election of aldermen in the new wards of Westport, even if vacancies existed, was void because not held in accordance with that law. Sess. Acts, 1891, p. 133. The state by the prosecuting attorney of the proper county may maintain a *quo warranto* proceeding in the supreme court to try the title to a municipal office. *State ex rel. v. Frazier*, 98 Mo. 426; *State v. Ins. Co.*, 8 Mo. 331; *State v. Stone*, 25 Mo. 555; *State v. Bermudy*, 36 Mo. 279; *State v. Lawrence*, 38 Mo. 538; *State v. Townsley*, 56 Mo. 107; *State v. Vail*, 53 Mo. 97. (2) *Quo warranto* is the appropriate remedy to oust one who claims title to an office under an invalid election. Mechem on Pub. Offices, sec. 478; High on Ex. Rem., sec. 638. (3) Respondents all claim under the same election and exercise the same office and franchise, and, therefore, are properly joined in this proceeding. *State v. McReynolds*, 61 Mo. 203; *State v. Rose*, 84 Mo. 198; *State v. Adams*, 44 Mo. 570; *State v. Jenkins*, 25 Mo. App. 484; *Rex v. Collingwood*, 1 Burr. 573; *Symers v. Rey*, Cowper, 489.

*W. A. Anderson* for respondents.

(1) The creation of the new third and fourth wards *ipso facto* resulted in vacancies in the board of aldermen. *State v. County Court*, 50 Mo. 317; *Rhodes v. Hampton*, 101 N. C. 629; *Stocking v. State*, 7 Ind. 326; *Clark v. Irwin*, 5 Nev. 92; *Walsh v. Commonwealth*, 89 Pa. 425; *State ex rel. v. Askew*, 48 Ark. 89; R. S., sec. 1585. (2) "All vacancies in the board of aldermen shall be filled by election in such manner as may be provided by ordinance" is the concluding sentence of section 1587, article 5, entitled "cities of the fourth class," Revised Statutes. This provision

prevails over the election enactment of 1889, and the amendments thereto of 1891. For a later statute which is general and affirmative does not abrogate a former one which is particular; and the manifest intention of the legislature is indisputably opposed to the abrogation of a special law or a law applicable to a particular class of things. *State ex rel. v. McDonald*, 38 Mo. 529; *State ex rel. v. Frazier*, 98 Mo. 426; *Mauro v. Buffington*, 26 Mo. 184; *State ex rel. v. Fial*, 47 Mo. 310; *St. Louis v. Ins. Co.*, 47 Mo. 146; *State v. DeBar*, 58 Mo. 395; *McVey v. McVey*, 51 Mo. 406; *Railroad v. Cass Co.*, 53 Mo. 17; *St. Louis v. Life Ass'n*, 53 Mo. 466; *State v. Green*, 87 Mo. 583; *St. Louis v. Alexander*, 23 Mo. 483; *Harrisburg v. Sheck*, 104 Pa. St. 53; *People v. Board of Supervisors*, 40 Hun, 353; *State v. Fitzporter*, 17 Mo. App. 271; *McKenna v. Edmunstone*, 91 N. Y. 231; *State ex rel. v. Stevenson*, 44 N. J. L. 371; *Wood v. Commissioners*, 58 Cal. 561; *Railroad v. Hoard*, 16 W. Va. 270. ( 3 ) The general election law is not applicable to a ward election held for the purpose of electing aldermen. ( 4 ) The eligibility of persons to be elected to and hold office is prescribed by the constitution, and these constitutional qualifications can be neither abridged nor extended. The Australian law prescribes additional qualifications for election to office, and impairs and defeats the constitutional right of one to be elected to and hold office; it is violative of the declaration of the bill of rights that "all elections shall be free and open." Const. Mo., art. 1 sec. 9. ( 5 ) The demurrer to the petition should be sustained because there is a defect of parties plaintiff, in that the prosecuting attorney has not exhibited "an information * * * at the relation of any person," as required to do by statute. R. S., sec. 7390.

GANTT, P. J.—This is a proceeding upon information of the prosecuting attorney of Jackson county *ex officio* to test the right of respondents to exercise

the powers and discharge of duties of members of the board of aldermen of the city of Westport, in Jackson county.

It is alleged that said city was and is a city of the fourth class, under the laws of this state; that prior to May 11, 1891, said city included certain territory which was divided into two wards; that by an ordinance of said city, duly passed by the board of aldermen, entitled "An ordinance to extend the corporate limits of the city of Westport over territory lying adjacent thereto," approved April 14, 1891, and taking effect from its approval, and by virtue of an election held for that purpose by the qualified voters of said city, in pursuance of said ordinance, on the eleventh of May, 1891, the corporate limits of said city were extended so as to take in certain additional territory described in the information. That afterwards, on the twenty-second day of June, an ordinance was duly passed dividing said city within its now extended limits into four wards; that by said ordinance the two old wards, numbers 1 and 2, comprised the same territory they occupied prior to the extension, and the third and fourth wards were made up entirely of new territory taken in by said extension.

It is then charged that on the twenty-ninth of June, 1891, the city council passed an ordinance providing for the filling of vacancies in the board of aldermen, which ordinance is set out in full. That on the thirtieth of June, 1891, the mayor of the city, in pursuance of said ordinance, issued his proclamation declaring vacancies existed in said board, on the ground that there were no representatives in said board from said new third and fourth wards, and called a special election to fill said alleged vacancies on July 11, 1891.

It is then alleged that the election was held and respondents, two each, were elected in said wards. That subsequently they took the oath of office, and are

now exercising all the rights of aldermen of said city. Relator charges that said election was illegal and void on two grounds, *first*, that in contemplation of law there were no vacancies in said board such as there was any authority to fill, and, *second*, if there were vacancies, the election was void because it was not held under the Australian ballot law, adopted in this state in 1889 and amended in 1891.

To this information respondents interpose a demurrer, assigning the following reasons why the writ of ouster should not go :  *First*.   That the information discloses on its face that respondents are the duly elected and qualified members of the board.  *Second*.  That the information does not state facts sufficient to authorize the relief prayed.  *Third*.  That there was a defect of parties plaintiff.

I.   We are met at the threshold with the technical objection that the prosecuting attorney is not permitted by the laws of this state to prosecute a writ of *quo warranto* "without the intervention of some third person as relator."   This contention is more plausible than sound.   By section 637, Revised Statutes, 1889, it is provided, "the prosecuting attorneys shall commence and prosecute all civil and criminal actions in their respective counties in which the county or state may be concerned."   That the state is interested in preventing any person usurping or intruding himself into an office created by its laws, is now firmly settled.   This is a proceeding by the prosecuting attorney *ex officio*.   It has been ruled uniformly since *State v. Merry*, 3 Mo. 278, that the writ of *quo warranto* is a writ of right and the attorney general need not ask leave to file his information.

In *State ex rel. v. Rose*, 84 Mo. 198, the precise point raised by the demurrer here was made, and it was ruled that "informations by the attorney general or prosecuting attorney *ex officio* may be filed without leave, as a matter of course."   This court has never

been disposed to deny the state the right to inquire, through her properly constituted officers, into the right of any person to one of its public offices. It is conceded by respondents that this court has often entertained and determined like proceedings, brought and prosecuted, in which the prosecuting attorney was the sole relator. This is certainly true, and it does seem to us that it is peculiarly appropriate that the prosecuting attorney should represent the state in such cases, and we see no reason for departing from this well-established practice. *State ex rel. v. Frazier*, 98 Mo. 426.

II. Having determined that the relator may maintain this proceeding, we are next led to inquire into his complaint. He, charges first that the respondents are usurpers because there were no vacancies in the board of aldermen to be filled. Section 1585, Revised Statutes, 1889, provides that "the board of aldermen may, by ordinance, divide the city into not less than two wards and two aldermen shall be elected from each ward." It clearly appears that, acting under this authority, the board divided the city of Westport into four wards, and that from the time the third and fourth wards were established, until the election of respondents, these wards had no representation in the board. That each of these wards under the law is entitled to two aldermen is perfectly clear. But relator claims they are not entitled to this representation until the next general city election in April, whereas respondents claim that as soon as the wards were lawfully created they became entitled to representation, and there were four vacancies in the board. To meet this claim relator relies upon section 1887 of the Revised Statutes, 1889, which provides that "Whenever * * * new wards shall be established, there shall be no election of a representative to the municipal legislature for such ward until the general election for corporation officers."

If this section was a portion of the charter of cities of the fourth class, or if it did not so clearly

appear that it was peculiar to cities of the second class there might be some force in relator's position, but from an examination of its history and its position in our laws we are satisfied it pertains to cities of the second class only. This section was originally section 48, page 50, of the Session Acts of 1887, "An act providing that any city having a population of more than one hundred thousand inhabitants may frame a charter," etc. When the revising committee arranged the present statutes this section was carried forward into them with a reference to the date of its adoption, and it is placed among those provisions having reference to cities of the second class alone. We think this is quite evident. The language of the section moreover is not such as is usual in referring to an alderman in cities of the fourth class.

Leaving out of view then this section, we recur to the proposition of relator, that there were no vacancies. Relator contends that inasmuch as section 1581 fixes the official term at two years from the first Tuesday in April, save when two aldermen are elected from the same ward, in which case the one receiving the smallest number of votes shall hold one year only, that these terms must begin at the general election and run together. We agree with him fully as to the regular terms, but we are now considering whether there is a vacancy. We think that both authority and the spirit of our institutions favor the view that when an office is created, and no restrictions for filling the vacancy are imposed, a vacancy arises *ipso facto.*

"The word 'vacancy' aptly and fitly describes the condition of an office when it is first created, and has been filled by no incumbent." *Walsh v. Commonwealth,* 89 Penn. St. 426. In *State ex rel. v. Askew,* 48 Ark. 89, the supreme court of that state said: "Vacancy is the state of being empty or unfilled. Vacant lands are unoccupied lands. Vacant house is an untenanted

house.   A vacant office is an office without an incumbent; and it can make no difference whether the office be a new or an old one.   An old office is vacated by death, resignation or removal.   An office newly created becomes *ipso facto* vacant in its creation." And in *State ex rel. v. County Court*, 50 Mo. 317, Judge ADAMS speaking for the court said, "This is a new office created by this act and *ipso facto* becomes vacant in its creation." *Rhodes v. Hampton*, 101 N. C. 629; *Stocking v. State*, 7 Ind. 326.

Nor are we impressed with the reasons that relator seems to think actuated the legislature in refusing representation to the new wards till a general election. Taxation without representation has ever been resisted in the United States.   When we consider that according to the allegations of the relator's petition a new territory as large as the old city had been added to the city and that the city council might project public works that would entail burdensome taxation on this new territory, if they had no voice in the city government, we can see no sound reason why the property-owners in those new wards should be denied representation in the council. Certainly, in the absence of a very clearly expressed intention to the contrary, we will not give such a construction to the charter.   We think on this point the law is with respondents.   Nor ought there to be any serious trouble about the length of the term of aldermen elected to fill a vacancy.   They are elected simply till the next general election.   We think this is evident from reading all the provisions together and applying the rule that statutes in "*pari materia*" are to be construed together.

III.   Respondents concede by their demurrer, that the election at which they were chosen was not held as required by article 3, chapter 60, of the Revised Statutes of Missouri, 1889, and as extended by act of the general assembly of Missouri approved April 4, 1891. These statutes introduced into this state the Australian

system of voting at elections, and by the amendment in 1891 (Sess. Acts, 1891, p. 136) the provisions were made to apply to all the election precincts in this state. If this law should govern this particular election, the admission that there was a total failure to comply with the regulations prescribed by the legislature if those regulations are consistent with the constitution, we think would invalidate the election. *Zeiler v. Chapman*, 54 Mo. 502; *State ex rel. v. Frazier, supra; Van Amringe v. Taylor*, 12 S. E. Rep. 1005.

But respondents seek to avoid the effect of this admission in their demurrer by insisting that the special provision in section 1587, that "all vacancies in the board of aldermen shall be filled by election in such manner as may be provided by ordinance" was not abrogated by the adoption of article 3, chapter 60, and the amendment thereto April 4, 1891, *supra*.

And the learned counsel for respondents in support of this contention relies upon the familiar canon of construction, that a later statute which is general and affirmative will not repeal a former which is particular, unless negative words are used or unless the provisions of the latter are irreconcilably inconsistent with, and repugnant to, the former. This rule is generally accepted with this qualification that after all it is really a question of intention, and when the legislative intent is manifest or apparent it must prevail. *State ex rel. v. Severance*, 55 Mo. 378. But we conceive that this rule has little to do with this particular case. The statute under which the city of Westport is organized is itself a *general statute*.

Moreover, the power of the legislature to regulate elections, and to amend the laws pertaining thereto in nowise infringes any property or vested right of the said city, and the inhabitants of that city are as much bound to obey a general law of this character as any other portion of the state, and besides that section

1902 expressly provides that "any municipal corporation in this state, whether under general or special charter, and having authority to pass ordinances regulating subjects, matters and things upon which there is a general law of the state, unless otherwise prescribed or authorized by some special provision of its charter, shall confine and restrict its jurisdiction and the passage of its ordinances to, and in conformity with, the state law upon the same subject." This section by force of law is a part of its charter and it cannot claim exemption from the general law of the state regulating elections. While it may properly make many local regulations they must not conflict with, but must be in conformity with, the state law.

We think it was essential to a valid election of aldermen, that the provisions of article 3, chapter 60, of the Revised Statutes, 1889, as amended by act approved April 4, 1891, should be observed. *Common Council v. Rush*, 82 Mich. 532. But council urge these acts are unconstitutional in that they add to the constitutional qualifications of one to hold office ; impair the right of one to be elected to office and violate the provision of the constitution that "all elections shall be free and open."

Every presumption is in favor of the constitutionality of an act of the legislature, and the courts are ever reluctant to declare a statute invalid. The power of the legislature to regulate elections is now too well determined to be longer questioned. This right has been exercised in all the states. It was most seriously challenged in states where laws were enacted requiring a registration of the electors as a condition precedent to voting, and the power of the legislature was upheld in many well-considered cases. *Capen v. Foster*, 12 Pick. 485. The power of the legislature to prevent fraud at the ballot box by all needful rules and regulations is clear. Of course, under the guise of regulation the legislature cannot *destroy* the constitutional right of

the voter. *Attorney General ex rel. v. Common Council*, 78 Mich. 545,

If, therefore, the provisions of article 3, chapter 60, of the Revised Statutes, 1889, and the amendments thereto of April 4, 1891, are obnoxious to the criticism of counsel for respondents they impair constitutional rights. After a careful examination of this law we fail to see how it makes any election less free and open. On the contrary the most careful regulation is made to insure a free exercise of the right of suffrage.

The reasons that prompted the passage of these laws are most admirably stated by the supreme court of Michigan in *Common Council v. Rush, supra*, as follows: "Frauds in elections produced the necessity of the registry laws. But these were not found sufficient to prevent frauds and abuses, which became so notorious that other means were found necessary to preserve the purity of elections. Fraudulent tickets were issued,— fraudulent in that they purported to be the regular party tickets, but in reality contained the names of some of the candidates of the opposite political party, and thus voters were deceived into voting for candidates not of their choice and contrary to their intention. The preparation and distribution of ballots by party agents furnished an excuse for large assessments upon candidates. Voters were supplied with tickets, and accompanied to the polls by party agents to see that the tickets furnished were deposited in the boxes. Votes became the subject of bargain and sale, and the purchaser accompanied the voter to the polls to see that the infamy was consummated by the deposit of the vote placed in his hands. Drunken men were taken to the polls, supported by their fellows. The voting places were overcrowded, and in this way voters were kept from the polls or deterred from voting. 'Workers' were employed, and paid by candidates and party managers to peddle tickets ; and not always were they employed for their most commendable qualifications, or from the

most worthy motives.    Secret organizations met on the
night previous to election and furnished their members
with 'vest-pocket' tickets,—a proceeding foreign to the
spirit of our government.    Intimidation of voters was
openly charged under the system, under which employ-
ers could stand in close proximity to the polls, and
distinguish what ticket their employes voted.    The
expenses of an election have become so great as to deter
many good men from accepting nominations.    Such are
some of the abuses that grew up under the old system,
rendering a reform absolutely necessary to secure fair
and honest elections, good government, and the perpe-
tuity of our institutions.    To such an extent have these
abuses been carried that one of the eminent counsel for
relator felt justified in asserting in his brief that 'fraud
in elections has become a fine art and corruption of
voters a profession ; and the governor of the state in his
message in January, 1889, made it the subject of earnest
and special comment."

This law aims to preserve to the voter his franchise
without interruption, annoyance or danger of being
defrauded.    The election is "open" within the meaning
of the constitution.    The vote of each elector is received
by the judges at public voting places.    It is free to every
qualified voter ; more free than when he was subjected
to all manner of annoyances by noisy turbulent crowds
impeding his way to the polls, and often impudently
and gratuitously assuming to dictate his choice for him.
Let us rise, if we can, to the true significance of the
constitutional provision, "all elections shall be free
and open."

It is not merely the right of every elector to cast his
ballot in an open place.    It was designed that this vote
so cast should be effective, carry its proper weight in
effecting the result, as the voluntary act of a freeman.
"Whenever another person by coercing me, or by coer-
cing or bribing my neighbor or by voting unlawfully casts
a vote or votes more than he is entitled to, my franchise

is infringed, for my vote now has less than its proportionate share of influence." Ballot Reform: Its Constitutionality, 23 American Law Review, 719. "Elections are free wherever the voters are subjected to no intimidation or improper influence. * * * Elections are equal when the vote of every elector is equal, in its influence upon the result, to the vote of every other elector." *People ex rel. v. Hoffman*, 116 Ill. 587; *Patterson v. Barlow*, 60 Penn. St. 54; *Davis v. School District*, 44 N. H. 398. It was with a view to preserve this high privilege the legislature enacted these laws. It is no less a pleasure than a duty to aid them in so commendable a purpose.

The case put to us of a party desiring to be a candidate for an office, but who can secure neither the nomination of one of the two great political parties, or of any other political convention, nor the certificate of a sufficient number of electors to entitle him to have his name placed on the ticket, does not strike us as a great hardship. The rights he would lose under these circumstances are purely imaginary, but the case supposed is so extreme, it will not be passed upon till it presents itself in a more tangible shape than it does here. It is conceived there is nothing in the law preventing a voter throwing away his vote on such a candidate if he desires to do so.

This law while new in this country has been received with great favor. It has been adopted by the legislatures of Arizona, California, Idaho, Illinois, Massachusetts, Maine, Nevada, North Dakota, Pennsylvania, West Virginia and Wisconsin, in the last two years. It is doubtless open to some objections. These can be corrected from time to time, but we think the objections here made to its constitutionality untenable. The demurrer is overruled.