THE STATE *ex inf.* WALKER, *Attorney-General,* v.
EQUITABLE LOAN AND INVESTMENT ASSOCIATION
OF SEDALIA.

In Banc, January 19, 1898.*

1. **Quo Warranto:** LEGAL CAPACITY OF ATTORNEY-GENERAL TO SUE.
The Attorney-General can, of his own motion and without leave of this
court, file an information in *quo warranto*, praying that a building
and loan association be ousted of its franchises and corporate
privileges, and he can take all other necessary steps to have such
cause passed upon and determined.

2. ———: CIVIL ACTION. Information in the nature of a *quo warranto*
is a civil suit.

3. ———: MEANING OF WRIT OF "QUO WARRANTO." Informations in
the nature of *quo warranto* long ago came into use and supplied the
place of writs of *quo warranto*, and it is held that the framers of the
Constitution, when they used the words "writ of *quo warranto*"
intended thereby in abbreviated form to say "informations in the
nature of *quo warranto*."

4. ———: CONSTITUTIONAL RIGHT: INSPECTOR OF BUILDING AND LOAN
ASSOCIATIONS. The Constitution gives the Supreme Court power to
issue writs of *quo warranto*, and such power can not be taken away
by the legislature, although the General Assembly may confer upon
an inferior court another and distinct remedy; as was done in 1895
by the act making it the duty of the supervisor of building and loan
associations to institute proceedings in the circuit court against such
delinquent associations, and further requiring that such proceedings
shall be conducted by the Attorney-General; but such act can not
abate the jurisdiction conferred on the Supreme Court by the Consti-
tution, nor deprive the Attorney-General of his common law and
inherent powers to file *ex officio* informations in the nature of *quo
warranto* in this court.

5. ———: ATTORNEY-GENERAL: LEGAL CAPACITY TO SUE: RELATOR.
The Attorney-General can file an information in a *quo warranto* pro-

*NOTE.—Decided June 29, 1897, and judgment entered as per stipulations January
19, 1898.

ceeding without leave of court. Nor is any relator necessary when such information is filed by him.

6. ———: PLEADING: "WILLFUL MALFEASANCE." The words "willful malfeasance" are not necessary in an information in *quo warranto* if it states the respondent "has used and still does use, without any warrant or legislative grant, the following liberties and franchises" *et cetera.*

7. ———: PRECEDENTS IN PLEADING. "Precedents are very good witnesses of what the law is."

8. ———: FORMS OF PLEADING. The proper allegations for an information in *quo warranto* are discussed.

9. ———: PRACTICE: ISSUE RAISED BY DEMURRER. A demurrer to an information in *quo warranto* raises an issue of law, which alone can be considered, and which can not be obscured by any issue of fact.

10. ———: BUILDING AND LOAN ASSOCIATIONS. Where a building and loan association has exceeded its corporate powers and has persistently violated the rules, restrictions and conditions prescribed by law, in issuing "full paid" up stock secured by pledges of its other stock, and by deeds of trust to secure the redemption and payment of such "full paid stock," and in acting as security for a bond investment company, the reasons are sufficient for the State to oust it of its franchises and corporate privileges.

## Quo Warranto.

DEMURRER OVERRULED.

To the information filed in this cause a demurrer has been introduced which necessitates copying the information, which is as follows:

"Now comes R. F. Walker, for the State of Missouri, and states that the defendant was created and organized as a building and loan association on the nineteenth day of July, 1887, under and in accordance with an act of the General Assembly of the State of Missouri entitled "An act concerning mutual savings fund loan and building associations," approved March 31, 1887, and ever since and now is exercising the franchises, rights and privileges conferred by said act of the legislature of the State of Missouri, and other acts amendatory and supplemental thereto, and having its chief office and place of business in the city of Sedalia,

in the county of Pettis, in said State.   And this relator charges that ever since its organization it has continuously within this State, and at the county of Pettis, aforesaid, offended against the laws of this State and has grossly abused and misused its corporate authority, franchises and privileges and unlawfully assumed and usurped franchises and privileges not granted to it by the laws of the State of Missouri, and especially in the following particular, to wit:

"That the defendant association has issued what it terms 'full paid stock' in shares of the par value of two hundred dollars each, and by which the defendant association, in its certificates issued for said stock, certifies that ———, the party to whom said stock was issued, was entitled to one or more shares of the capital stock of defendant association upon which there has been paid in the full sum of two hundred dollars for each share, the said sum being the dues in full on said shares of stock at the rate of one dollar per month on each share for the full period of two hundred months from its date, and that the holder and owner of said shares of stock was entitled to the redemption thereof in the full sum of two hundred dollars on, and not before, the expiration of one hundred months from the date of its issue, and also to receive thereon as the share of the earnings and profits of the business of said association belonging to the said shares of stock so issued seven per cent interest per annum, payable in the sum of seven dollars each six months during the whole period of one hundred months, except that the last payment of interest is two thirds of said sum for four months, said interest being payable agreeably to and only on the presentation and delivery, at the place of payment indicated therein, of the coupons attached to said certificates of stock as they respectively matured, and the said association guaranteed to secure the re-

demption of said shares and the payment of the sum
of two hundred dollars on each and all the said cou-
pons attached thereto; that there was deposited with
the trustees named in said certificates certain securities
for the redemption thereof, as hereinafter set forth,
and the said certificates further provided, that in con-
sideration of the security thus given for the redemp-
tion for said stock, the holder thereof released all right,
interest and benefit of such share in and to the earnings
and profits of said association over and above the seven
per cent interest per annum, payable as therein pro-
vided, and in said certificates declaring that the same
was not negotiable until the certificates indorsed on the
back thereof had been duly signed by the said trustee,
and upon the back of each of the said certificates of
stock was the indorsement of the said trustee that each
of said certificates was secured by the deposit of evi-
dences of indebtedness, as stated in the face of said
certificates of stock, which were held as security for
the redemption of said shares.    That each of said cer-
tificates of stock was issued as aforesaid by the defend-
ant association, and it declared that to secure the
redemption and payment thereof, and all the interest
coupons attached thereto, as well as other shares of
stock, and coupons of the same series, there was
deposited with James C. Thompson, as trustee, obliga-
tions for loans due said association, in an amount ten
per cent more than the total par value of all of the
shares in said series, and secured by pledges of the
stock of said association with said loans, and also by
deeds of trust on real estate, appraised at double the
amount of said loans, and with approved titles, and
which said deeds of trust and pledged stock were also
deposited with the said trustee, and that the defendant
association agreed and guaranteed that the securities
deposited with said trustee should, during the whole

of the said one hundred months, be maintained in the amount and character as aforesaid, to secure the redemption and payment of said shares of stock, and that the said trustee would hold the said obligations and securities aforesaid for the benefit of the lawful holder of said shares of said series, and that the said trustee was authorized to collect said obligations and indebtedness or to sell the same and to use the proceeds thereof to redeem said shares in case default should be made by the defendant association in the redemption and payment thereof or of the interest thereon.

"And this relator further states that the said defendant association has continuously since the time of its organization issued a large number of shares of its full paid stock, as aforesaid, said shares being negotiated and sold upon the faith of the securities deposited with the trustee, as in the said certificates stated, and as shown by the indorsement of the said trustee placed thereon, and signed by him, and that the said defendant association withdrew and took out of its assets its bills receivable to an amount exceeding the amount of its said outstanding shares of stock at least ten per cent, and deposited the same with the said trustee as security for the payment of said shares of stock and for the payment of the interest thereon, and upon the faith of said certificates and of the deposit of security, as aforesaid, the defendant association has sold and has now outstanding of said shares of full paid stock one hundred and eighty-eight thousand dollars or more, together with the notes and obligations and assets of the defendant association as security therefor, as aforesaid.

"And this relator further states that there was organized under the laws of the State of Missouri a certain corporation known as The Pettis County In-

vestment Company, having a capital stock of two thousand dollars and its chief place of business in the city of Sedalia aforesaid, and that by virtue of certain acts of the General Assembly of the State of Missouri it became and was necessary for the said Pettis County Investment Company to deposit with the State treasurer of the State of Missouri one hundred thousand dollars of good and available securities or cash, to be approved by said treasurer, for the protection of the investors in such bonds, certificates or debentures as might or should be issued by the said Investment Company; and thereupon the defendant association, without consideration, issued and delivered to the said State treasurer ninety thousand dollars ($90,000) par value of its full paid shares of stock secured by a deposit of one hundred thousand dollars of its bills receivable and obligations secured by deeds of trust, as hereinbefore stated, with one Adam Ittel as the trustee, and the said Ittel signed the said indorsement on the back of each of said certificates representing the said shares of stock of the tenor and effect aforesaid, and the certificates for said shares of stock to the amount of said ninety thousand dollars bearing the indorsement of said trustee, was by the defendant association delivered and deposited to and with the said State Treasurer as security for whatever liability might be incurred by the said Pettis County Investment Company, as aforesaid, and that said State Treasurer now holds said ninety thousand dollars of said full paid stock and the said Adam Ittel now holds one hundred thousand dollars of the said obligations and notes payable to the defendant association as security for the payment of said stock, as aforesaid.

"And this relator further avers that the defendant association has continuously paid and is now paying the interest at the rate of seven per cent per annum

upon all of the said outstanding full paid shares of stock issued by it as aforesaid, except that held by the said State treasurer, when it has not earned and is not now earning that amount of interest upon its stock, and that said interest is so paid upon the said full paid shares out of the capital of said association and out of the earnings belonging to the other classes of stockholders therein.

"That by reason of the facts aforesaid said defendant association has rendered itself incapable and unable to prosecute the business for which it was organized and for which it received its franchise from the State, and has become and is wholly insolvent, and a continuation and perpetuation of the unlawful means and acts aforesaid is of great harm and injury to the public and a great wrong is done to all those people dealing with said association by reason of the privileges and franchises granted to it by the State of Missouri. And your relator avers that the said action of the defendant association, as hereinbefore alleged, is a gross perversion of the franchises granted to it by the State of Missouri and an unsurpation of privileges not granted to it and of great injury to the public. Wherefore, the Attorney-General, who prosecutes in this behalf for the State of Missouri, prays the consideration of the court here in the premises, and that proceedings of law may be issued against the defendant that it may be ousted of its franchises and corporate privileges."

The demurrer thereto is the following:

"Now comes the Equitable Loan and Investment Association of Sedalia, Missouri, and demurs to the information in the above entitled proceeding in the nature of a *quo warranto*, for the following reasons:

"*First.* Because the plaintiff in the relation specified has not legal capacity to sue.

"*Second.* Because there is a defect in the parties plaintiff.

"*Third.* Because the petition does not state facts sufficient to constitute a cause of action."

*J. H. Rodes* and *Charles E. Yeater* for respondent.

(1) The attorney-general had no discretionary power to institute this proceeding at his relation against a building and loan association, and had no powers whatever in such a suit, except to institute and prosecute a suit as the State's attorney on the request and at the relation of the supervisor of building and loan associations. *State ex rel. v. Flitcraft*, 36 S. W. Rep. 675; Laws of Mo. 1895, pp. 31, 32, secs. 7, 8; High's Ex. Leg. Rem. [2 Ed.], secs. 617 and 697; *State v. Consolidation Coal Co.*, 49 Md. 5; *Commonwealth v. Ins. Co.*, 5 Mass. 230; Thompson on Corp., sec. 6775; *In re Bank of Mt. Pleasant*, 5 Ohio St. 249. (2) The allegations of the information that the respondent association has pledged certain of its loans to guarantee the redemption of its full paid stock and the payment of interest thereon do not constitute a ground for forfeiture, because: *first*, such a misuser of the franchise is not charged in the information as a willful malfeasance of the respondent association and appears from the face of the information to be no more than a misapprehension of the law. *State ex rel. v. Wood*, 13 Mo. App. 143; *State ex rel. v. Societe Republicaine*, 9 Mo. App. 119; 5 Thompson on Corp., secs. 6604, 6608, 6612. Because, *second*, the respondent association was advised by an official opinion of the Attorney-General, the relator herein, that it had a legal right to so pledge such loans, and did so innocently and in good faith,

being thereby misled by the relator who instituted this proceeding. Official Opinion of Att'y-Gen., 1 Am. Rep. B. & L. Ass'ns, p. 75.    Because, *third*, the public has no interest in this alleged misfeasance and this proceeding subserves no public purpose, the shareholders being protected by the remedies afforded by the supervision statutes. 5 Thompson on Corp., sec. 6610; *Harris v. Railroad*, 51 Miss. 602.    Because, *fourth*, the deposit of the full paid stock of the respondent association with the State treasurer was a nullity and will shortly be terminated by law.    Mo. Acts 1897, p. 90, sec. 1. (3) Upon the state of facts alleged in the information, even if held a misuse of respondent's franchise, the courts deny a forfeiture, and particularly in the case of mutual corporations, because of the irremediable hardship which would result to the many innocent shareholders.    *State ex rel. v. People's, Etc., Ass'n*, 42 Ohio St. 584; *State ex rel. v. Oberlin Building, Etc., Ass'n*, 35 Ohio St. 264; *State v. Minn. Thresher Mf'g Co.*, 40 Minn. 213; *State v. Bank*, 8 Vt. 489; *Bank Com'rs v. Bank*, 6 Paige (N. Y.), 509.

*Edward C. Crow*, Atttorney-General, and *W. S. Shirk* for the State.

(1)    The statute appointing a supervisor of building and loan associations and giving him the exclusive right to institute actions for the winding up of such associations and the appointment of a receiver does not deprive the Attorney-General of his common law rights to prosecute a proceeding by *quo warranto*.    *State ex rel. v. American S. & L. Ass'n*, 67 N. W. Rep. 1; *Kane v. People*, 4 Neb. 512; *State v. Messmore*, 14 Wis. 115; *State v. Allen*, 5 Kan. 213; *State v. Baker*, 38 Wend. 71; *People v. Banghton*, 5 Col. 487; *People v. Turnpike*

*Road*, 23 Wend. 222. (2) The act of April 20, 1895, giving to building and loan associations the right to issue full paid stock was not in force when the acts complained of were done, and the law enforced at the time the acts were done, and the forfeiture incurred are applicable and no other. *Commonwealth v. Lykins Water Co.*, 110 Pa. St. 391; *Fisher v. Patton*, 33 S. W. Rep. 451. (3) Respondent says: "The respondent association was advised by the official opinion of the Attorney-General that it had a legal right to pledge such loans and did so innocently and in good faith, being thereby misled by the relator who instituted these proceedings." This is not true; no such opinion was ever given by the Attorney-General to the respondent, but this court will hardly listen to this excuse upon a demurrer to the information containing no such allegations, especially when the relator denies the fact. (4) The acts complained of are wholly wrong and beyond the power and authority conferred upon the respondent. Not a single feature of building and loan associations contemplated by our statute is observed. A contract is made, which destroys all of the features of the statute making building and loan associations mutual companies. A share of stock is issued which is withdrawable only one hundred months after its issue; directly contrary not only to the letter of the contract, but to the whole theory of building and loan associations. Its bills receivable are deposited with a trustee as security for such stock; no more gross and inexcusable acts could have been done by a corporation. Spelling on Ex. Rem., secs. 1812, 1813; *Ins. Co. v. Needles*, 113 U. S. 580; *People v. Plank Road Co.*, 57 Barb. 458; *People v. Bank*, 12 Mich. 536; *In re Jackson Marine Ins. Co.*, 4 Sandf. Ch. 562; *State v. Relief Ass'n*, 29 Ohio St. 405; *State v. Standard Life Ass'n*, 38 Ohio St. 286.

SHERWOOD, J.—1. Several points are raised by the demurrer which will now receive consideration; and first as to the capacity of the Attorney-General to institute this proceeding in manner and form as it has been instituted. As to this point it is the settled law of this State that such officer can, of his own motion and without leave of this court, file an information in *quo warranto*, and take all other subsequent and necessary steps to have such cause thus instituted, passed upon and determined. *State ex inf. Circuit Attorney v. Bernoudy*, 36 Mo. 279; *State ex inf. Attorney-General v. McAdoo*, 36 Mo. 452; *State ex rel. v. Steers*, 44 Mo. 223; *State ex rel. v. Bishop*, Ib. 229; *State ex rel. v. Hays*, Ib. 230; *State ex rel. v. Vail*, 53 Mo. 97; *State ex rel. v. Townsley*, 56 Mo. 107; *State ex rel. v. Rose*, 84 Mo. 198; *State ex rel. v. Town of Westport*, 116 Mo. loc. cit. 605; *State ex rel. v. McMillan*, 108 Mo. 153. See, also, Short on Mand. and Quo Warranto, *175; High, Ex. Leg. Rem. [2 Ed.], sec. 45, and cases cited. This has been the rule of this State ever since *State v. Merry*, 3 Mo. 278.

At common law "the old writ of *quo warranto* is a civil writ, at the *suit* of the crown; it is *not a criminal* prosecution. . . . . . . . This was the true *old* way of inquiring of usurpations upon the crown, by holding fairs or markets, viz., by writs of *quo warranto*. Then informations in the nature of a *quo warranto* came into use and supplied their place." These observations fell from Mr. Justice WILMOT in *Rex v. Marsden*, 3 Burr. 1817, in the year 1765. See High, Ex. Leg. Rem., sec. 603. In Blackstone, written in 1758, some seven years before the last mentioned period, it is asserted that the proceeding by *quo warranto* "is properly a criminal method of prosecution." Cooley's Black., book 3, ch. 17, p. 262. But whatever the original of the writ,

whether civil or criminal, it is certain now at the present time and for a long period anterior to this, it has been and is but a civil suit.    There is a distinction, of course, to be taken, a distinction pointed out by SCOTT, J., in *State v. Ins. Co.*, 8 Mo. 330, between a writ of *quo warranto* and an information in the nature of a *quo warranto*, but while this is true, yet it is also true even in Blackstone's time, the issuance of the writ itself, owing to its cumbersome length, had long fallen into disuse, which resulted in the modern substitutionary and more speedy method of the filing of *ex officio* informations by the Attorney-General.    Cooley's Black., book 3, ch. 17, p. 262.

Our Constitution provides in the third section of its sixth article, that this court "shall have power to issue writs of *habeas corpus, quo warranto, certiorari* and other original remedial writs, and to hear and determine the same."    Inasmuch as the issuance of a writ of *quo warranto* had not occurred in England for centuries; inasmuch as courts, lawyers and text-writers had been accustomed for hundreds of years to use the expression *"writ of quo warranto"* as the legal equivalent and synonym of "information in the nature of *quo warranto*," it will be presumed that the framers of our Constitution were not unmindful or ignorant of such a common form of expression and the meaning which it bore, and therefore when they used the words "writ of *quo warranto*" they intended thereby only to convey in abbreviated form the meaning that phrase had for so long a period and so continuously been employed to convey, to wit, "informations in the nature," etc.

Since writing the above it has been found that in other States possessing organic laws like our own, similar conclusions have been reached.    *State v. Railroad*, 34 Wis. 197, and cases cited; *State v. Gleason*, 12 Fla.

190, and cases cited; High's Ex. Leg. Rem., secs. 610, 611.

And the jurisdiction of this court in this regard being conferred by the Constitution, it is beyond the power of the legislature to take it away, and it will not be intended that a legislative enactment was designed to take such jurisdiction away, although such enactment should confer another and distinct remedy upon some inferior court or board. *State v. Allen,* 5 Kan. 213; *State v. Massmore,* 14 Wis. 115; *Kane v. People,* 4 Neb. 509; 19 Am. and Eng. Ency. of Law, 664; *People v. Bristol Co.,* 23 Wend. 222; *People v. Hillsdale Turnp. Co., Ib.* 254; *State v. Baker,* 38 Wis. 71; High, Ex. Leg. Rem., sec. 615; 2 Spelling, Ex. Rlf., secs. 1772, 1873. In consequence of this well recognized principle, sections 7 and 8 of the laws of 1895, pages 31 and 32, in relation to the duties of the supervisor of building and loan associations, to institute proceedings in the circuit court against a delinquent building and loan association, and that such proceeding shall be conducted by the Attorney-General, can not abate the jurisdiction conferred on this court by the Constitution nor deprive the Attorney-General of his common law and inherent powers to file *ex officio* informations as in the present instance. And it is well enough to say in concluding this paragraph of this opinion, that the briefs in this cause are not properly entitled, since the Attorney-General in such cases as this is proceeding *ex officio* after the manner of the common law, and entirely independent of and above our statute of *quo warranto* which is derived in substance from 9 Ann. c. 20, Tancred's Quo Warranto, pp. 13 and 14. So that a relator or leave to file an information *ex officio* are alike unnecessary to the Attorney-General. And this court has twice determined that in such informations, no relator

is required. *State ex inf. Circuit Attorney v. Bernoudy*, 36 Mo. 279; *State ex rel. Brown v. McMillan*, 108 Mo. 153.

It results from these considerations then that the Attorney-General's "legal capacity to sue" (as it is termed) must, in this instance, stand undoubted.

2. Another ground of demurrer urged under the general head that "the petition does not state facts" etc., is that the information does not charge that the misuser of the franchise is a *"willful malfeasance"* on the part of the respondent company. But one case has been found which announces that unless the words *"a willful nonfeasance and* misfeasance" are used in an in-formation against a corporation that such information, lacking such words, will be fatally defective. *State v. Columbia & Hamp. T. P. Co.*, 2 Sneed, 254.

If, by the term *"willful"* is merely meant "an act done designedly, intentionally or purposely, as contra-distinguished from accident or absence of intention or design" (*Com. v. Perrier*, 3 Phil. R. 232; Winfield, Adjudged Words & Phrases, p. 645), then there would be no serious objection to its use; and the information, alleging as it does that the respondent company, from the time of its organization, to wit, July 19, 1887, has *continuously,* down to the time of filing the information, done the acts charged in the first paragraph of that information, then the information does charge in sub-stance and effect that the acts alleged were willfully, to wit, designedly or intentionally, and not accidentally done. And this court will presume that acts which the law will not sanction if done for over nine years, were not altogether the result of unfortunate mistake or momentary misapprehension.

But if the word "willful" is to be used to convey its usual signification, to wit, that of one with a *bad* motive or purpose (*Com. v. Kneeland*, 20 Pick. 220) then

its use would be foreign to a case of this sort, because this is simply a *civil* proceeding, and it has been held that it is enough to work a forfeiture that the performance of the condition is neglected or designedly omitted, and that the ingredient of a *bad or corrupt motive is not necessary*. *People v. Kingston, Etc., Turnp. Co.*, 23 Wend. 193; 5 Thompson on Corp., sec. 6612.

Moreover, the ancient precedents of forms of informations *ex officio* in the nature of *quo warranto*, do not employ the word *"willful"* nor indeed any equivalent word; they simply say, after appropriate preamble: "Have used and still do use, without any warrant or royal grant, the following liberties and franchises, to wit, of all which liberties, privileges and franchises aforesaid, the said ——, during the time aforesaid, have usurped, and still do usurp, upon the said lord the king, to the great damage and prejudice of his royal prerogative; whereupon the said attorney of the said lord the king, for the said lord the king, prays the advice of the court in the premises, and due process of law against the said —— in this behalf to be made, to answer to the said lord the king, by what warrant he claims to have, use, and enjoy the liberties, privileges, and franchises aforesaid."

And "this is the form, whether the information be brought for an usurpation without any original title, or for a subsequent forfeiture, where the original title is not disputed." Tomlin's Law Dic. 281, Title, Quo Warranto. And precedents are very good witnesses of what the law is. *State v. Meyers*, 99 Mo. *loc. cit.* 114.

Nor does the word "willful" appear in the forms of *ex officio* information in the nature of *quo warranto* in modern precedents of such informations. *State v. Pawtuxet Turnpike Corporation*, 8 R. I. 182; *People v. Bristol Turnpike Co.*, 23 Wend. 222; *People v. Kingston Turnp.*

Co., Ib. 193; *State v. Gleason*, 12 Fla. 190; *State v. Messmore*, 14 Wis. 115; *People v. Bank*, 6 Cow. 196; *People v. Impor. Co.*, 103 Ill. 491; Mechem, Pub. Off., sec. 491.

The information must therefore be held free from flaw though lacking the word *"willful."*

3. It has been urged on behalf of the respondent company that it was advised "by an official opinion of the Attorney-General, the relator herein, that it had a legal right to so pledge such loans, and did so innocently and in good faith, being thereby misled by the relator who instituted this proceeding." But to this it may shortly be replied that the demurrer in this case raises an issue of *law*, which is alone for consideration, and will not be allowed to be obscured by any consideration of an issue of *fact*.

4. The act approved April 20, 1895, Laws of that year, page 111, section 14, operating as it does only prospectively, can not cure acts of previous misuser alleged in the information. *Com. v. Lykens Water Co.*, 110 Pa. St. 391; and the act of March 27, 1897, Laws 1897, page 90, section 1, has as little to do with arresting the progress of the present prosecution. Indeed the respondent admits in effect the illegality of the act of depositing the alleged full paid up stock of the respondent company with the State treasurer, but claims that the act "was a nullity and will shortly be terminated by law." This of itself is a sufficient admission to show the *ultra vires* nature of the act referred to.

In *Turrett v. Taylor*, 9 Cranch, 43, 51, Mr. Justice STORY said: "A private corporation created by the legislature may lose its franchises by a *misuser* or *nonuser* of them; and they may be resumed by the government under a judicial judgment upon a *quo warranto* to ascertain and enforce the forfeiture. This is

the common law of the land, and is a *tacit* condition annexed to the creation of every such corporation."

"Where being legally incorporated for authorized objects a corporation has habitually employed its franchises in an illegal manner to accomplish objects so authorized, or employed them to accomplish objects not authorized in its charter or articles, such acts constitute a perversion." 2 Spelling, Exr. Rlf., sec. 1812.

*Quo warranto* "will lie either to forfeit the charter or existence of the corporation, or to forfeit particular franchises belonging to it. It lies to put an end to the corporation as a whole for non-compliance with conditions essential to the right to exercise corporate powers of the kind granted to it in its charter or claimed by it in its articles, or for a total perversion or abandonment of its powers legally derived and vested in the incorporators; and it lies on the same grounds to forfeit particular franchises, in which case judgment of forfeiture of these particular franchises may be rendered without affecting the corporate existence. The establishment against a corporation, before a judicial tribunal in which opportunity for defense is afforded, that its condition is such as to render its continuance in business hazardous to the public or to those who do business with it; that it has exceeded its corporate powers; and that it has persistently violated the rules, restrictions, or conditions prescribed by law,— constitutes sufficient reason for the State which created it to reclaim the franchises and privileges granted to it." *Ib.*, sec. 1813.

And as corporate grants are always assumed to have been made for the public benefit, any conduct which destroys their functions, maims and cripples their separate activity, and takes away free and independent action, affects unfavorably the public interest. *People v. Refining Co.*, 121 N. Y. 582.

It is quite apparent that: *First.* The defendant association unlawfully assumed and usurped franchises and privileges not granted it by the laws of Missouri, in issuing "full paid stock" secured by pledges of other stock of said association, and also by deeds of trust, to secure the redemption and payment of said "full paid stock." *Second.* The defendant association unlawfully assumed and usurped franchises and privileges not granted it by the laws of Missouri, in acting as surety for the Pettis County Investment Company to the State treasurer for any liability said Pettis County Investment Company might incur. *Third.* That though the defendant association had the right to issue full paid or prepaid stock, there is nothing in the law under which the association was chartered that will authorize it to make this "full paid stock" preferred stock by using certain securities of the association to guarantee the payment thereof. *Hohenshell v. Home Sav. & Loan Ass'n*, 140 Mo. 566.

For these reasons we adjudge the information sufficient in law, and if so advised, the respondent corporation may plead further, for which purpose seven days' time is granted from the date of filing this opinion. All concur, except BRACE, J., not sitting.