STATE ex inf. HADLEY, Informant, v. MERAMEC ROD & GUN CLUB, Respondent.

St. Louis Court of Appeals, December 22, 1906.

1. **LOCAL OPTION: Clubs; Selling Liquor to Members.** While a bona fide social club with a limited membership actually owning its liquors may dispense such liquors among its members for pay without violation of the law relating to the sale of intoxicating liquors in counties which have adopted the local option law, when such a club is not bona fide and is intended only as a scheme or device for the purpose of selling liquor, sales by such clubs are contrary to law and a *quo warranto* proceeding will lie to revoke its charter.

2. ———: ———: ———: Where a club was organized, in a county which had adopted the local option law, for the ostensible purpose of the physical development of its members and engaging in athletic sports, under article 11 of chapter 12, Revised Statutes 1899, and was incorporated by *pro forma* decree, and where the club leased for its purpose a building formerly

occupied by the manager and leading spirit of the club, as a saloon, parts of which building were fitted up with pool table and athletic equipments, with bar where liquor was sold to members in one apartment, and where the evidence showed that the manager, the former saloonkeeper, had entire control of its business, was paid a salary but kept no account of the moneys received from sales of liquor, and it was shown by the testimony of many of the members that they joined the club merely for the purpose of convenience in getting their drinks, that no athletic sports of any kind were engaged in, the club was incorporated and conducted as a scheme to evade the local option law and an order annulling its charter and franchise is necessary.

### Original Proceeding by Quo Warranto.

CHARTER OF RESPONDENT ORDERED ANNULLED.

*Albert Chandler* and *Edward D'Arcy* for informant.

*Kortjohn & Kortjohn* for respondent.

NORTONI, J.—This is an original proceeding. At the suit of the Attorney-General a writ of *quo warranto* was awarded against the Meramec Rod and Gun Club, citing it to show cause why its charter should not be revoked for misuser of its franchises in that it is alleged to be engaged in the business of selling liquor in violation of the local option law and to that end, maintains a resort in the nature of a bar-room and grog shop in the city of Kirkwood. The respondent appeared and answered. A commissioner was appointed by the court to take testimony. The proof made before the commissioner discloses the following facts.

One John F. O'Laughlin was, for about three years prior to the adoption of the local option law in the city of Kirkwood, engaged in the saloon business in that city. His dramshop license expired December 22, 1903. The local option law having been adopted after the issue and just prior to the expiration of his said license, it was, of course, impossible for him to obtain a further license to conduct his said business. His saloon had

been situate on Main street in the De Arban building, on which he had a lease for several years in advance at a rental of $600 per year, payable $50 per month. From the records of the club, in O'Laughlin's handwriting, we ascertain that on January 2, 1904, just ten days after the expiration of his dramshop license, Mr. O'Laughlin and three others "met and discussed ways and means to organize a hunting and fishing club, with a reading and billiard room where the members could meet for social intercourse." At this meeting Mr. O'Laughlin agreed to advance not to exceed $300 and another agreed to advance $200 to launch the club, both to be secured by notes signed by the officers of the contemplated organization, etc. As a result of this meeting, parties applied to the circuit court of St. Louis county, under the provisions of art. 11, chap. 12, R. S. 1899, and obtained a *pro forma* decree of incorporation under the statute authorizing the incorporation of associations for "benevolent, religious, scientific, fraternal, beneficial or educational purposes," which, under the provisions of sec. 21, art. 10 of our Constitution, are exempt from the corporation tax therein mentioned. The articles of agreement filed by the incorporators and affirmed by the grant of the charter, declare the object and purposes of the respondent club to be as follows:

"To promote the physical development of its members, to educate and train them in athletics, field sports, and gymnastics, such as baseball, football, running, jumping, lifting, throwing, wrestling, bowling, vaulting, hunting and fishing, and to engage in and take part in athletic contests, and make public exhibition of any of the above named gymnastics and field sports, and to obtain by written lease or privilege suitable grounds for a club house and gymnasium, and to engage in social intercourse with its members."

The records of the club of date February 2, 1904, disclose that the club's charter had been secured and

that the club had leased the DeArban building on Main street for club purposes for a period of two years, taking effect at once, at a rental of $600 per year, payable in monthly installments of $50 each. This is the same building occupied prior to December 22d, as a saloon by O'Laughlin and on which he had a lease. This record also shows that O'Laughlin was at that meeting chosen steward of the club at a salary of $75 per month, and instructed to procure an *"icc-box," "glassware,"* tables, chairs, etc., for the use of said club. The club had a board of directors. Its officers consisted of president, secretary and treasurer, and steward. It adopted by-laws and its membership was limited to two hundred. It actually has a membership of one hundred and ninety-six persons. To become a member, the applicant is required to submit his application to the board of directors and be recommended by two members, when such board of directors may approve or reject the application. If approved, the applicant is required to pay one dollar membership fee, which goes into the treasury of the club. It is said that the board of directors have rejected some applications; how many, is not stated.

The club house, as stated, was the building formerly occupied by O'Laughlin as a saloon. It consisted of some two or three rooms downstairs and four or five rooms upstairs. The principal room on the ground floor is furnished with a pool table, chairs, tables, punching-bag, boxing-gloves, etc., and a small room is partitioned off in a corner of this room in which is kept the *"ice-box," "glasses,"* etc., as well as divers and sundry bottles of whiskey, beer, soda-pop and other liquid refreshments and cigars. It is fitted up with what they denominate in the evidence as a back bar in the nature of a shelf on the wall, on which glasses, etc., are kept. Cheese, crackers, oysters and other edibles for lunches are also kept in store in this small room, and since this action was instituted a more extensive restaurant has

been added to the club and it is said it now furnishes
meals. There is also a reading room on the first floor,
where, besides a few books, several daily papers and
about a dozen periodicals may be found on the table
for the accommodation of the members. One room up-
stairs is occupied by a billiard table, one is a sleeping
room for the club steward, and one room occupied by
another club member, for the same purpose. It seems
that shortly after its organization, the club leased a
small tract of land on the Meramec river for a boat-
house. The boathouse never materialized, however. It
is said in the evidence that the club members could not
agree on what sort of a boathouse to erect, and therefore
that feature of the club's original purpose was not pros-
ecuted to consummation. In fact, none of the athletic
sports and games designated in its charter were ever
organized or carried out save and except some little box-
ing and bag-punching in the club rooms. The evidence
tends to show that the members played pool, billiards
and cards as well in these clubrooms. There is evi-
dence tending to show that the club gave several fish
fries and oyster suppers to its members in the club-
rooms during its little less than two years existence.
O'Laughlin was first the steward and afterwards secre-
tary and treasurer of the club at a salary of $75 per
month all of the time, whether steward or secretary and
treasurer. He now occupies the latter office and has for
many months. Besides being secretary and treasurer of
this club, he is the proprietor of a saloon at Valley Park.
From a careful study of the entire evidence, the impres-
sion is irresistible that O'Laughlin is the master-spirit
of this club, or, in other words, that the club is O'Laugh-
lin's club, and that it was planned, organized and is
dominated and guided by his genius. It appears that he
was formerly in the brokerage business in the city of
St. Louis. The evidence shows him to be a man of
energy, smart and shrewd, possessed of some education

at least, and able to keep the books and records of his club in such a shape and to so arrange and direct its affairs as to make it appear somewhat, although not entirely, bona fide.

From beneath the cover of all this carefully planned display of bona fides contained in the club's record books, and the guiding genius of the master-hand of O'Laughlin, there appears here and there throughout the entire case the miserable makeshift of a club, organized under the provisions of the Constitution and the statutes with respect to benevolent, religious, scientific and educational associations, for the mere purpose of evading the local option law and rendering to O'Laughlin a neat recompense by dispensing liquors in and paying the rent of, the building for which he was obligated by lease several years in advance, and also paying to him a salary of $75 per month, first, as steward, and afterwards as secretary and treasurer. Even though, for the first six months, the secretary of the club was another, and O'Laughlin was steward only, we find every entry of the record pertaining to the corporate acts of the institution to be in the handwriting of O'Laughlin, signed by the regular secretary and president, however. It is manifest that these records are carefully planned and well kept by him. Indeed, these records are as the voice of Jacob, but upon their being examined under the rays of the evidence before us, there is discovered therein the hand of Esau. Because of the carefully laid plans of the master-spirit of the club, industrious counsel representing the Attorney-General have encountered many difficulties in presenting the true facts to the court. All of the testimony elicited was from members of the club. O'Laughlin himself was placed upon the stand by the relator and from him it was ascertained, among other things, that the club had no bank account. All of the moneys taken in were deposited in the bank and checked

121 App—24

upon by O'Laughlin in his own name; that besides paying the bills for the liquors and other supplies, the proceeds were devoted to the payment of his salary of $75 per month and a small salary to one other employee and the rent of the building. All of the witnesses testified that there is constantly on hand a supply of whiskey, beer, cigars, etc., as in a barroom generally; that the plan is for one or more members to go in and order what liquors they desire and the steward will attend them at a table where they may either eat or drink, play cards, etc., if they so desire. The plan of payment was first by small coupons. The club furnished the members with books containing five and ten cent coupons at 50 cents or $1.00 each and the steward would detach coupons sufficient to cover the drinks ordered. Some of the club members testified that this plan was followed in order to keep within the law, as they understood it, etc. Afterwards the members commenced paying for drinks in cash; some ran an account and settled at the end of the month. There is evidence tending to show that members would meet at the club, play pool, billiards, cards, do some boxing, punch the bag, etc., and drink some liquor. Some would lunch and occasionally a member would read some of the periodicals or newspapers. O'Laughlin said, in speaking of the books: "Of course the members did not get interested in the books, but we have quite a number, I guess fifty or one hundred of them." He also said: "We have had some very interesting debates there by learned men." When pressed in the examination on this question, it turned out that no such debates within the meaning of that term, were had. It appeared that the members discussed or argued the Kirkwood sewers pro and con, and other questions pertaining to the city government, at the tables of the club, and these discussions were classed by him as debates when on the witness stand explaining the educational features of the organization. Some mention is

made of business meetings of the club, etc., yet every member produced as a witness other than O'Laughlin himself admits that he never attended a business meeting of the club; that while they saw on the blackboard such meetings, advertised, and while they frequented the club at various hours of the day or night, none were ever present when such a meeting was in progress; that none of them were interested in the financial affairs of the club sufficiently to inquire with respect to such meetings or inform themselves thereabout. No one, other than O'Laughlin, knew how much, if any, funds the club had or what was done with surplus moneys unless it was to defray the expenses of the fish fries and oyster suppers mentioned. It appears that some of the members who attended the fish fries and oyster suppers were called upon occasionally to pay to the steward 25 cents or 35 cents which was denominated by the steward as dues. Some of the members testified they were not called upon for payment of dues at any time. It does not appear that these last mentioned members attended the fish fries and oyster suppers. This may explain why they did not contribute thereto. It appears that no liquors were sold to non-members of the club. They were frequently supplied, however, on purchases by members as their guests, and members of this and other like clubs in Kirkwood reciprocated such courtesies. Member after member admits on the witness stand that he joined the club for the purpose of having some convenient place to obtain a drink, inasmuch as the adoption of the local option law by the vote of what was termed the "silk stockings" over the "hoodlums" did not operate to slacken his thirst. Others insist that they became members for the purpose of social intercourse, with the convenience or privilege of obtaining an occasional drink as incidental thereto. It is obvious that the contemplated drink was an element which operated to influence many at least, if not all of

the applicants, to seek membership in this "rod and gun club" organized under the benevolent, religious, scientific and educational law of the state, and here we may be permitted to say without deciding, that it is a grave question indeed, whether this charter on its face, reveals in its declaration of purpose, a proper object authorizing it to have and enjoy a corporate existence under the statutes mentioned, and thereby escape the incorporation tax mentioned in the constitutional provision referred to, so as to render it immune from successful attack in quo warranto by the Attorney-General as being unauthorized by the very law upon which it predicates for an existence. This feature of the matter is not presented by appropriate allegation in the information, however, and will not be further noticed. [But see State ex rel. Henderson v. Lesueur, 99 Mo. 552, 13 S. W. 237; State ex rel. Ritchey v. McGrath, 95 Mo. 193, 8 S. W. 425; State v. Brawner, 15 Mo. App. 597.] Waiving this question, we find that counsel representing the Attorney-General have summarized the evidence as it is in the record before us, and showing the non-exercise of the franchises attempted, at least, to be granted, correctly as follows:

"Base Ball, .............. No Team;  none
Foot Ball, ............. No Team;  none
Running, .................... none
Jumping, .................... none
Lifting, ............... The 'lid'  only
Throwing, ................... none
Wrestling, .................. none
Bowling, ......... No Alley;  none
Vaulting, ................... none
Hunting, .................... none
Fishing, ...........Individually  only
Contests, ................... none
Public Exhibitions, ......... none"

While it is manifest from the evidence that the club wholly failed to carry out the declared purposes of its charter, it is likewise manifest therefrom that it did dispense and sell liquors to its members with a free hand and for which it accepted compensation, and that its existence as a club is a mere sham for the purpose of evading the laws with respect to the sale of intoxicating liquors. The case of State ex rel. v. St. Louis Club, 125 Mo. 308, 28 S. W. 604, decided by our Supreme Court, settled the law, in this State to the effect that while a bona fide social club with a limited membership actually owning its liquors and supplies in common, may dispense such liquors among its membership for pay, without such act constituting a sale of liquors by retail or in the original package within the meaning of the dramshop law, it also affirmed the well-established doctrine that when such a club is not bona fide and is maintained only as a mere scheme or device for the purpose of selling liquor in evasion of the laws, such dispensation of intoxicating liquor by it, is a sale thereof within the meaning of such laws, for which the parties are amenable, etc. [See also State ex inf. Hadley v. Rosehill Pastime Club, 121 Mo. App. 81, 97 S. W. 978; State ex rel. v. Bacon Club, 44 Mo. App. 86; State ex rel. v. Easton, etc., Club, 20 Atl. (Md.) 783; State ex rel. v. McMasters, 14 S. E. Rep. (S. C.) 290.]

We find the fact to be that the club here involved is of the class last mentioned, a mere device or sham, a scheme organized and conducted for the purpose of evading the local option law, adopted by the people of Kirkwood, wherefore it is ordered and adjudged by the court that the respondent, Meramec Rod and Gun Club, a corporation, be and the same is hereby dissolved; that its said charter and the franchises therein granted be and the same are hereby declared forfeited for misuser and the same are revoked and recalled and to be in

the future for naught held and esteemed; that its said members be and they are hereby forever prohibited from exercising any of the corporate rights and franchises granted by said charter and that the relator herein have and recover from said respondent its costs paid out and expended in this behalf, and that execution issue therefor. *Bland, P. J.,* and *Goode, J.,* concur.