STATE OF MISSOURI, upon the Information of SAM M. WEAR, Prosecuting Attorney of Greene County, Missouri, relator, v. BUSINESS MEN'S CLUB, respondent.

Springfield Court of Appeals, February 24, 1914.

1. QUO WARRANTO: Amendment of Pleadings: Statutory Provisions. In a *quo warranto* proceeding to oust a corporation of its franchise on account of misuser, the prosecuting attorney may amend his information so as to allege the continuation of the acts complained of up to the date of the trial. (Secs. 1821, 1848 and 1864, R. S. 1909.)

2. CORPORATIONS: Testing Validity of Incorporation: Quo Warranto not Method. In a proceeding against a corporation by *quo warranto* the State cannot question the fact that the corporation was duly and legally authorized. To test the validity of the act of incorporating, the information should be filed against the individuals who, it is claimed, are usurping the prerogatives of a corporation.

3. QUO WARRANTO: Dissolution of a Corporation: Parties. Where the object of a *quo warranto* proceeding is to effect the dissolution of a corporation which has an actual, legal existence, the proceeding is properly against the corporation.

4. ———: Nature of: Purpose. *Quo warranto* proceedings are in the nature of a public prosecution. Their purpose is the recovery to the State of usurped or forfeited franchises and not the redressing of private grievances.

5. CORPORATIONS: Misuser of Franchises: Forfeiture: Necessary to Show What. To forfeit a corporate franchise for misuser in *quo warranto* proceedings it must be shown that the acts complained of are detrimental to the public welfare and that they work or threaten substantial injury to the public, or amount to a violation of the purpose for which the corporation was organized.

6. ———: Franchise of: Powers: Definitions. A corporation franchise is the right to exist as an entity for the purpose of doing things which are permitted under the law authorizing the incorporation. A corporation's powers are the things it is authorized to do.

7. ———: Quo Warranto: Forfeiture of Franchise. The State, by *quo warranto* proceedings, may inquire into and ascertain the validity of the objects and purposes for which a corporation is organized, although the corporation has procured a *pro forma*

State ex rel. v. Men's Club.

decree from the circuit court and has had issued to it a certificate of incorporation.

8. ――――: Objects: Purposes: Authorized and Unauthorized: Scope of Quo Warranto. Where some of the objects and purposes for which a corporation was formed are duly authorized and others are not, although the State in *quo warranto* proceedings cannot deny the corporate existence, yet the corporation's right to exercise the objects and purposes which are not authorized may be thus attacked.

9. ――――: Fraternal: Beneficial: Educational: Scientific: Statutes Discussed. Secs. 3432 and 3435, R. S. 1909, providing for the organization of corporations for fraternal, beneficial, educational or scientific purposes discussed relative to scope and latitude allowed.

10. ――――: Charter: Meaning of Expressions in. In the articles of incorporation the statement that the corporation is chartered for "any and all other lawful indoor sports and harmless games that may be acceptable and beneficial to its members," only applies to that kind and character of exhibitions which are specifically mentioned before in the charter.

11. ――――: Purposes for Which Organized: Acts Outside of Charter. A corporation organized for the purpose of giving athletic exhibitions for its members' entertainment, *held* not within the purview of secs. 3432 and 3435, R. S. 1909, which provide for the organization of corporations for fraternal, beneficial, educational and scientific purposes.

12. ――――: Forfeiture of Franchise: Quo Warranto: Facts Reviewed. In a *quo warranto* proceeding to oust a corporation of its franchise because of misuser, evidence examined and *held* to show that the corporation was engaged in giving public boxing exhibitions in violation of the criminal laws of the State, that this was the only purpose of its incorporation and that it should be ousted of its franchise.

13. PRIZE FIGHT: Definition: Statutory Inhibition. Term "prize fight" construed, pointing out the nature and elements of a contest such as is prohibited by statute.

14. ――――: Authority of Third Class Cities as to: General Statutory Provisions. Though Sec. 9253, R. S. 1909, confers upon cities of the third class authority to license, regulate or suppress boxing and sparring exhibitions, such section cannot take precedence over Sec 4681, R. S. 1909, which prohibits such exhibitions.

15. STATUTES: Special and General: Construction. The mere grant of a power to a municipality, with no words clearly showing an intention to make such power exclusive, will not exclude the general State law.

Quo Warranto.

WRIT OF OUSTER AWARDED.

*Sam M. Wear,* Prosecuting Attorney, and *Mann, Todd & Mann,* for relator.

(1) The contests staged under the auspices of respondent corporation were prize fights. State v. Patton, 64 N. E. 850; Seville v. State of Ohio, 15 L. R. A. (Old) 516; Commonwealth ex rel. Pratt v. McGovern, 66 L. R. A., 280; State v. Purtell, 43 Pac. 783; People v. Finucan, 80 N. Y. Supp. 929. (2) The respondent, "The Business Men's Athletic Club," is a mere subterfuge and a scheme organized and conducted for the purpose of evading the law which prohibits the giving of public sparring or boxing exhibitions. State ex inf. Hadley v. Rose Hill Pastime Athletic Club, 121 Mo. App. 81; State ex inf. Hadley v. Kirkwood Social Athletic Club, 121 Mo. App. 87; State ex inf. Hadley v. Merremac Rod and Gun Club, 121 Mo. App. 364; Commonwealth v. Mack, 73 N. E. 534. (3) Respondent corporation is not within the purview of any of the provisions of Art. 10, Ch. 33, and its purposes are not covered by Secs. 3432, 3433, 3435, R. S. 1909. Vredenburg v. Behan, 33 La. Ann. 627, 637; Prairie Slough Fishing and Hunting Club v. Kessler, 159 S. W. 1080. (4) Respondent's charter should be forfeited. State ex rel. Mason v. Springfield African Social and Improvement Club, 154 S. W. 158.

*Patterson & Patterson, Neville & Gorman,* for respondent.

(1) The contests staged by respondent were not prize fights. State v. Purtell, 56 Kas. 478, 480, 481; People v. Taylor, 96 Mich. 576. (2) Distinction between "prize fighting" and "boxing" or "sparring." Secs. 4679, 4681, 9253, R. S. 1909, Acts 1913, p. 429.

(3) Boxing exhibitions are not *per se* unlawful; their publicity alone renders them so. Sec. 4681, R. S. 1909. The exhibitions given by respondent were not public. (4) The purposes of the club were scientific, fraternal—beneficial and educational.

ROBERTSON, P. J.—The prosecuting attorney of Greene county filed in this court his information alleging that the defendant was organized as a corporation ostensibly under the provisions of Chapter 33, Article 10, Revised Statutes of 1909, authorizing the incorporation of associations for benevolent, religious, educational and scientific purposes, and charged that the respondent had grossly perverted and misused its charter authority, franchises and privileges, and unlawfully usurped franchises and privileges not granted it by the laws of the State of Missouri, especially in that it had not pursued the objects and privileges as set forth in its articles of association, and that its objects and purposes are not entirely fraternal, beneficiary, educational and scientific, and that it had not and did not maintain a club where its members and such persons as may become members could meet for advancement and for the purposes contemplated by law; that from the date of its organization up to the time of filing the information the respondent had conducted within the city of Springfield prize fights in violation of the law, and had aided, abetted and assisted persons who were engaged in public sparring or boxing exhibitions, all in violation of the law, and especially in violation of sections 4679, 4680 and 4681 of the Revised Statutes of 1909, and that it had not kept or performed any of the alleged objects and purposes of its organization and that in fact it is nothing more nor less than an organization incorporated under the form of law for the sole purpose of aiding and abetting prize fights and public sparring or boxing exhibitions in violation of the law; and that the un-

lawful acts complained of constitute all of the business or things done by the respondent under and by virtue of the franchise and authority conferred upon it as a body corporate; that the respondent had wilfully, continuously and unlawfully misused and abused the privileges and authority conferred upon it by the laws of this state, and that the nonuser and misuser in violation of the laws of the State had been of great harm and injury to the public and a perversion and misuser of the franchise granted to it and an usurpation of franchise and privileges not granted to the respondent, all to the great injury of the general public and the State of Missouri, and praying that the respondent be ousted of all of its franchises and corporate privileges and that the same may be forfeited.

The respondent's answer admits the incorporation but denies generally the other allegations in the information.

A commissioner was appointed by this court to take the testimony, which he did, the respondent appearing thereat, and the issues are now before us for consideration.

The testimony offered is all in behalf of the relator and discloses that the respondent was, by *pro forma* decree of the Greene county circuit court, on May 24, 1913, declared a body corporate under the provisions of Chapter 33, Article 10, of the Revised Statutes of 1909, after which the Secretary of State on June 14, 1913, issued his certificate upon articles of association stating the purposes as follows:

"First. Promoting social intercourse and friendly relation among its members.

Second. Providing for and giving to its members entertainment and lawful exhibition of feats of strength, agility and activity; such as boxing, sparring, wrestling, basket ball and any and all other indoor sports and harmless games that may be acceptable and beneficial to its members.

Third.  Providing for its members books, magazines and periodicals suitable for their entertainment.

Fourth.  Providing suitable, harmless and healthful refreshments to and for its members.

Fifth.  Procuring suitable club rooms, furniture, fixtures and paraphernalia for the carrying out of the foregoing purposes.''

These articles of association were signed by fourteen citizens of the city of Springfield.

During the taking of the testimony the prosecuting attorney stated that he would ask permission to amend his information so as to allege the continuation of the acts complained of up to that date and now asks leave to so amend.  The relator has announced that if the amendment is allowed it desires to offer no additional testimony.  This amendment, we think, should be allowed under section 1848, Revised Statutes of 1909, permitting amendments before final judgment, which is, by section 1864, Revised Statutes of 1909, extended to informations in the nature of *quo warranto*.  Section 1821, Revised Statutes of 1909, recognizes the rights of the parties litigant to have all facts material to the issues in the case determined up to the date of the trial.  [In this behalf see Alfter v. Hammitt, 54 Mo. App. 303; Ward v. Davidson, 89 Mo. 445, 455; Cohn v. Souders, 175 Mo. 455, 467, 75 S. W. 413; and Clothing Co. v. Steidemann, 120 Mo. App. 519, 526, 97 S. W. 220.]

The first business transaction by the respondent and the first regular meeting of the members of the association, according to the records offered in evidence, was on July 25, 1913, at which time a president, secretary and treasurer were elected, who were also appointed as a committee to draft by-laws governing the club and to present same at the next meeting.  The secretary was authorized to purchase such books and records as might be necessary in order to keep a complete record of all business transacted by the club,

"and especially to have a complete record of all appli-
cations for membership and when passed upon by the
proper committee." The following also appears in.
the record of the first meeting:

"A motion was made and carried providing that.
if the members of the membership committee were
absent or could not conveniently be located for the pur-
pose of passing on all applications for membership,
the president be empowered to pass thereon.

It was suggested that the secretary be instructed
to write the Future City Athletic Club of St. Louis
for copy of their by-laws."

The record of the respondent club recites that on
August 1, 1913, pursuant to call of the president, the
members met and elected nine of their number direc-
tors, one of whom was elected vice-president and gen-
eral manager. The record then recites that, "Upon
motion, the manager was authorized to stage any
athletic entertainment for the amusement of the mem-
bers at any time without consulting other directors
of the club, and to receive all moneys that might be
taken in by the club, out of which funds he is to pay
himself a salary of $100 per month and defray all ex-
penses incident to the operation of the club." The
committee appointed to draft by-laws submitted a
draft thereof which was adopted. Three members of
the board were appointed as "permanent members of
the membership committee."

The record further recites that on August 2, 1913,
"Applications for membership to the number of one
hundred and forty-six, as shown by the record of mem-
bers, were reported favorably by the membership com-
mittee, and were accepted by the board of directors."
This is all of the record of that meeting.

On August 5, 1913, a similar record was made
showing that eighty-one applicants were admitted to
membership. A similar record states that on August
7, 1913, eighty-two applicants were admitted and that

on August 15, 1913, twelve applicants were admitted. On August 22, 1913, applications for membership to the number of twenty-one were voted on by the membership committee but six were rejected because they had not signed the application blank in person; the remaining fifteen were passed upon favorably and duly elected to membership, as the record states, by the board of directors. On August 30, 1913, twenty-seven applications were submitted and two were rejected for the reason that the membership fee was not paid.

This constitutes the entire record of the business transacted by the respondent so far as the books disclose. None of the minutes of the meetings are signed by any officer of the association; neither do the minutes disclose who were present at any of the meetings, nor that any of the minutes of previous meetings were read and approved. Up to August 30, 1913, 361 members had been received and at the date of the trial there were 523 members, but the board of directors did not, so far as the records offered in evidence disclose, pass on the additional applicants as required by the by-laws. The manager of the respondent was called as a witness by relator and he testified that only the membership committee had met since August 30, 1913, and that no record had been kept of its meeting and action.

The by-laws adopted by the association, so far as material in this case, read as follows:

## BY-LAWS AND RULES AND REGULATIONS
Governing the Business Men's Athletic Club
of Springfield, Mo.

### Article 1.

Section 1. Classes of Members. There shall be five (5) classes of members: 1, Honorary; 2, Resident; 3, Nonresident; 4, Athletic; 5, Junior.

Section 2. As many members may be admitted as the board of directors may from time to time deem desirable.

Section 3. Any person who shall receive the unanimous vote of the directors present at any regular meeting, may be elected an Honorary Member; provided notice of such proposed election shall be given to each of the directors, with the notice of such meeting. Honorary Members shall be exempt from the payment of admission fee and dues, and shall enjoy all the privileges of the club, except that they shall not vote nor shall they have any right or title to or interest in the property or assets of the club.

Section 4. Athletic Members. The board of directors shall have the power to elect as an Athletic Member any amateur athlete not less than 18 years of age, who, in their judgment, might be a desirable addition to the club, and who shall be proposed in writing to the athletic committee and favorably considered by the committee on membership. Athletic membership shall continue in the discretion of the board of directors, and such members shall enjoy the privileges of Resident Members, except that they shall not vote nor hold office, nor shall they have any right or title to or interest in the property or assets of the club.

Section 5. Junior Members. The board of directors shall have the power to elect as Junior Members, boys over the age of 14 years and under the age of 18 years entitling them to the privileges of the bath, gymnasim, courts and alleys, under such rules and regulations as the committee thereon may provide.

Section 6. How Elected. All members of the club shall be elected by the board of directors. If the candidate shall receive three or more negative votes, he shall be rejected.

Applications for Membership. Every candidate for membership shall make a written application to the committee on membership, giving his name and

address and designating the class to which he is proposed.

Section 9. Termination of Membership. Membership in this club may be terminated: 1, by resignation after all amounts due by the member to this club shall have been paid; 2, by forfeiting status as an amateur, and, 3, by nonpayment of indebtedness to the club beyond the period allowed by the finance committee; 4, by expulsion for misconduct. At the termination of his membership a person shall forfeit and lose all his rights in and to the property of the club.

## Article 2.

Section 1. Resident, Nonresident, Athletic and Junior Members shall pay a fee of one dollar ($1.00) per annum as entrance fee, and shall agree to subject themselves to assessments for any benefits that may be attended by them, except that Athletic Members shall be exempt from assessments for benefits or entertainments in which they are actively participating.

## Article 3.

Section 1. (Provides for annual meeting).

Section 2. (Provides for special meetings).

Section 3. A quorum of club members for the transaction of business at any annual or special meeting shall consist of not less than five (5) members.

## Article 4.

Section 1. At the annual meeting of the club in 1913, there shall be appointed by the president a board of directors, which shall consist of nine (9) members, of which five (5) shall constitute a quorum at any meeting of the directors. Thereafter there shall be elected at the annual meeting nine directors, three of which shall hold office for one year, three for two years and three for three years; thereafter at the annual meeting, three directors shall be elected for the purpose of holding office three years.

Section 2. (Provides for filling vacancy on board).

Section 3. The board of directors shall fix by resolution the number of its regular meetings, the days upon which same shall be held, the hour at which they shall be convened; provided that not less than one shall be held each month. Special meetings may be called by the president or manager of the club, or by any three members of the board.

Section 4. The board shall adopt and from time to time, as occasion may require, amend and revise house rules for the guidance of members and the management and discipline of employees of the club.

Section 5. (Provides for punishment and expulsion of members).

### Article 6.

Section 1. (Defines duties of officers).

Section 2. (Defines duties of vice-president).

Section 3. The secretary shall attend the meetings of the board of directors and of the members of the club and record their proceedings as approved; execute such papers as may be required; preserve and prevent the improper use of the seal of the club; issue notices to the members and cards of introduction to the club house; cancel and issue certificates of membership; transmit to his successor in office his official effects and perform such other duties as are usually performed by such an officer and as may be required by the board of directors.

Section 4. (Defines treasurer's duties).

### Article 7.

Section 1. Standing Committee. For the better execution of the board of directors, the president shall appoint the following standing committees, to be made up from the members of the board of directors: 1, a finance committee of three members; 2, a member-

ship committee of three members; 3, a house committee of three members.

### Article 8.

Section 1. (Defines duty of finance committee).

Section 2. (Defines duty of house committee).

Section 3. It shall be the duty of the membership committee to make active inquiry as to the fitness of all applicants, to receive objections thereto by any members of the club and report their action to the board of directors not later than one day previous to any exhibition or entertainment to be given by the club.

### Article 9.

Section 1. These by-laws shall be subject to suspension, modification, amendment or repeal, and shall cease to be of effect after the next regular annual meeting of the club, unless then ratified.''

The respondent commenced business by subleasing a dance hall and club rooms, for which, as the manager testified, they ''paid $25 for the first boxing exhibition we put on and $35 for the second, and their lease expired and we were not able to rent those rooms any more, so moved out. That was after this information was filed against the club, and we didn't try for quite a while to find other quarters.'' After leaving these subleased quarters the respondent continued to operate in the upstairs of a building over a livery stable. The room is about 75 or 80 feet square, fitted up with a ring in the center, as were also the first quarters, with seats built up on four sides. The ring is about twenty feet square, with canvas on the floor, and enclosed by ropes. The only business that appears to have been transacted by the club in any effort to carry out the purposes designated in its articles of association was giving what they called boxing contests. These are described in the relator's brief, and not questioned by respondent, as follows:

"The respondent has given three contests, the first one being held on the night of Labor Day in the year 1913, the contestants being Tom Smith of Bartlesville, Oklahoma, and Tom Abbott of McAlester, Oklahoma, who are professionals engaged in the business of giving such contests at various points over the country; they took places in the ring in the middle of the room and wore padded gloves on their hands and struck at and struck each other with as much force as they could exert; the contest was scheduled to last ten rounds, but only lasted two and one-half rounds; in the middle of the third round Smith was knocked down; other people helped Smith to his feet and led him out of the ring and the referee stopped the contest; each contestant was paid the sum of fifty dollars for giving the contest; there were present at this contest probably one hundred people, and this contest was held in the first club rooms of respondent, which were on the third floor over the McGregor-Noe Hardware Company on St. Louis street.

"Another contest was held between Magirl and Abbott in the quarters over the livery stable; this contest was scheduled to last ten rounds but lasted two rounds and one minute of the third round; during this time the contestants struck each other, their object being to strike each other as hard as they could; in the third round Abbott was knocked down and remained on the floor three or four seconds, got up, was knocked down again, and the bout was then stopped by the referee, the statement being made that he stopped it because Abbott was not in condition to go further, and that prior to having been knocked down these two times Abbott's condition was good, but as a result of these knock downs he was not in condition to proceed; Magirl and Abbott are professionals engaged in the business of giving these contests in various cities over the country; Magirl and Abbott were each paid the sum of seventy-five dollars by the re-

spondent for giving the contest; they had on their hands padded gloves similar to those used in the contest between Abbott and Smith, the gloves weighing six or eight ounces, and the regular weight for a prize fight glove is four ounces; and at this contest there were present two or three hundred people.

"A third contest was held between Frankie Conley of Kenosha, Wisconsin, and Bennie McGovern of St. Louis, which was scheduled to and did last ten rounds; the contestants wore gloves and struck each other as hard as they could, and at this contest there were present three hundred or three hundred and fifty people; Conley and McGovern are professionels and it is their business to give these contests at various cities over the country; all of these contests were held under the Marquis of Queensberry rules, which provide the length of the rounds, intermissions, etc., one of their provisions being that if either contestant is knocked down and is unable to be on his feet and continue the contest within a space of ten seconds, that irrespective of which contestant has had the advantage prior to that point that the one so unable to continue automatically loses by reason of said inability and the other contestant is automatically the winner; in all of these contests each contestant had two or three seconds or assistants who stayed at the corner of the ring and between the rounds rubbed and fanned the contestants and sought to revive and strengthen them; in each contest they had a referee and a timekeeper, and prize fights are held under the Marquis of Queensberry rules in a roped-off ring or arena similar to the one where these contests were held with referee and timekeeper as officials, and each contestant has seconds; an admission fee was charged to these contests and the price charged varied according to the location of the seats chosen by the club members the same as is the custom in attending any performance at a theater."

178 Mo. App. 36

Preliminary to a discussion of the merits it is essential to determine by what legal propositions we must be governed in our disposition of this case. This being a proceeding against the corporation, it follows that the State cannot question the fact that it was duly and legally organized. Where the object is to test the validity of the act of incorporating, the information should be filed against the individuals who it is claimed are usurping the prerogatives or a corporation; but if it is to effect the dissolution of a corporation which has an actual legal existence, or to oust a corporation of some power which it unlawfully exercises, then the proceeding is properly against the corporation. [People v. Rensselaer & S. R. Co., 15 Wend. 113, 30 Am. Dec. 33; State v. Fleming, 147 Mo. 1, 44 S. W. 758; 5 Thomp. on Corp. (2 ed.), Sec. 5811; State ex rel. v. Gravel Road Co., 116 Mo. App. 175, 193, 92 S. W. 153; State ex rel. v. Equitable Loan & Inv. Assn., 142 Mo. 325, 341, 41 S. W. 916; State ex rel. v. Small, 131 Mo. App. 470, 479, 109 S. W. 1079; State ex rel. v. Gordon, 233 Mo. 383, 135 S. W. 929.]

*Quo warranto* proceedings are in the nature of a public prosecution, having for their object the recovery to the State of usurped or forfeited franchises, and are not for the purpose of redressing private grievances.

In order to forfeit a corporate franchise for misuser, in *quo warranto* proceedings, it must be shown that the acts complained of are detrimental to the public welfare and must be such as to work or threaten substantial injury to the public, or such as to amount to a violation of the purpose for which the corporation may have been organized.

The corporate franchise is the right to exist as an entity for the purpose of doing things which are permitted under the law authorizing the incorporation. The things which the corporation is authorized to do are its powers as distinguishable from its franchise, that is, its right to exist as a corporation. If, there-

fore, the corporation engages in a business not author-
ized by the statute under which it is incorporated, it
is only doing something in excess of its powers; unless
unlawful or against the public welfare, it is not a usur-
pation of franchise ordinarily. [State ex inf. v. A. T.
& S. F. Ry. Co., 176 Mo. 687, 709, 75 S. W. 776; State
v. Minnesota Thresher Mfg. Co., 3 L. R. A. 510, 41 N.
W. 1020, (Minn.).]

That the parties forming this club presented their
articles of association to and procured from the cir-
cuit court of Greene county a *pro forma* decree and
had issued to them by the Secretary of State a cer-
tificate of incorporation, does not preclude the State by
*quo warranto* from inquiring into and ascertaining the
validity of the objects and purposes, or any one of
them, for which the corporation is organized. [State
v. Fleming, 147 Mo. 1, 11, 44 S. W. 758; State ex rel.
v. Wilson, 216 Mo. 215, 275, 115 S. W. 549.]

When it developes that a corporation was formed
for objects and purposes which are duly authorized
but that included in its articles of association are other
objects and purposes not authorized by the statute,
an information attacking the conduct of the corpora-
tion as to the authorized portions is not in violation
of the rule above announced, that in a proceeding
against a corporation its existence is admitted. That
rule cannot apply where some of the purposes stated
are legitimate and others illegitimate, because in
attacking the right to exercise the illegitimate portions
thereof the State does not deny the existence of the
corporation but only charges that it is seeking to ex-
ercise certain asserted powers not authorized by law.
In the case at bar the information, as has been noted
above, must necessarily be held to admit the validity
of the incorporation of the respondent for the purposes
stated therein other than in the second paragraph of
the purposes as set forth in the articles of association,
and as the respondent has joined issue on that para-

graph we shall treat it as the only one before us for review. If to do the things, or any of them, set out in the second paragraph of the purposes of the articles of association should not be permitted, as not authorized by the act under which respondent is incorporated and as detrimental to the public, then the information in this case will lie. [The Eastern Plank Road Co. v. Vaughan, 14 N. Y. 546, 1 Clark & Marshall on Corp., Sec. 76; State ex rel. v. Gravel Road Co., 116 Mo. App. 175, 193, 92 S. W. 153; State ex inf. v. Equitable Loan & Inv. Co., 142 Mo. 325, 341, 41 S. W. 916.]

Considering the second paragraph, we hold that the purposes there stated are not a subject of incorporation under section 3432, Revised Statutes of 1909, as a society formed for benevolent, religious, scientific, fraternal-beneficial or educational purposes; also, that the purposes set forth in that paragraph are not purposes that can be classed as incident to either of the other named objects. It is not claimed that this club is a religious or benevolent organization. The term "fraternal-beneficial" is applied to organizations on the lodge plan paying death or sick benefits. Sections 7109 and 7117, Revised Statutes 1909. The only terms of the statute that are claimed to apply to the corporation now under consideration are "educational and scientific." Section 3435, Revised Statutes 1909, defines and specifies the kinds of organizations that may be incorporated under the general heads mentioned in section 3432. Those which may be incorporated under the terms educational or scientific are grouped together by said section 3435 as follows: "Any school, college, institute, academy or other association formed for educational or scientific purposes, including therein any association formed specially to promote literature, history, science, information or skill among the learned professions, intellectual culture in any branch or department, or the establishing of a museum, library, art gallery, or the erection of a public monu-

ment, and in general, any association, society, company or organization *which tends to the public advantage* in relation to any or several of the objects above enumerated, and whatever is incident to such objects, may be created a body corporate and politic by complying with sections 3432 and 3433.'' It will be noted that the last clause of this section characterizes corporations that may be formed under this chapter as such that ''tend to public advantage.'' It seems clear to us that while athletic training, even in boxing, sparring or wrestling, may have some educational value to those trained therein; yet, the mere entertainment of its members with such athletic exhibitions is entirely foreign to the purposes outlined in this statute.

The following excerpt from the opinion in State ex rel. v. Lesueur, 99 Mo. 552, 559, 13 S. W. 237, in which, however, only a bare majority concurred in going so far, suggests no doubt the limit to which the Supreme Court considered the right of incorporation under this act extends. The brief of the Attorney General shows that he suggested to the court that this statute did not permit the incorporation of a ''mere pleasure club,'' and the court, responding to this suggestion, said: ''The objects and purposes of the proposed corporation are: (1) The encouragement of debating, reading and literature; (2) the enjoyment of rational social amusements; (3) the playing of tenpins, chess, checkers and other lawful games of the kind. The first of these declared purposes is clearly educational; and the others seem to be added as matters of amusement and incidental to the first. That they are incidental is shown by the subsequent statements wherein it is expressly declared that there shall be no saloon in connection with the club, that drinks shall not be sold by it or any of its members, and that the association shall not have in view any pecuniary profit. Had the articles of association specified

only the first of the designated objects, still the members of the association, under appropriate by-laws, might indulge in any of these amusements without violating the charter. Some degree of liberality must be allowed in the formation of those associations where all pecuniary profit is excluded."

In State ex inf. v. Rod & Gun Club, 121 Mo. App. 364, 366, 98 S. W. 815, involving a corporation organized "To promote the physical development of its members, to educate and train them in athletics, field sports and gymnastics, such as baseball, football, running, jumping, lifting, throwing, wrestling, bowling, vaulting, hunting and fishing, and to engage in and take part in athletic contests, and make public exhibition of any of the above gymnastics and field sports, and to obtain by written lease or privilege suitable grounds for a club house and gymnasium, and to engage in social intercourse with its members." Judge NORTONI remarks (p. 372) : "that it is a grave question indeed, whether this charter on its face, reveals in its declaration of purpose, a proper object authorizing it to have and enjoy a corporate existence under the statutes mentioned, and thereby escape the incorporation tax mentioned, in the constitutional provision referred to, so as to render it immune from successful attack in *quo warranto* by the Attorney General as being unauthorized by the very law upon which it predicates for an existence."

It follows, from what we have stated above, that all things done under said second paragraph of the purposes of respondent's articles of incorporation are without authority derived from the sections of the statute under which it is incorporated. The words in the said second paragraph, "any and all other lawful indoor sports and harmless games that may be acceptable and beneficial to its members," can only be held to apply to that kind and character of exhibitions which are specifically thereinbefore stated.

Having concluded that the provisions made for the exercise of the respondent's corporate powers in the said second paragraph are not such as are authorized by the law under which it is incorporated, it yet becomes essential to determine whether or not to permit the exercise of this power will be detrimental to the public welfare or is a recognition of the right of parties, under the guise of the corporation laws, to violate the criminal laws in a manner in which individuals cannot, and that, therefore, the information of the prosecuting attorney in this behalf should be entertained.

For the purpose of determining whether or not the exhibitions given by the respondent were as a matter of fact public within the meaning of said section 4681, we consider the irregularities elsewhere noticed that disclose an intention on the part of the organizers and managers of the respondent to disguise its real purposes and also that only the nominal charge of one dollar for membership fee was made, that no qualifications for membership were fixed, that the respondent claims that these sparring matches were a proper subject for incorporation and yet that a fee was charged all members for enjoying the privileges, and that some of these exhibitions were advertised as are other exhibitions for the benefit of the public—all of which makes clear to our minds that the exhibitions were intended to be and were for the benefit of such of the public as would pay the price of admission and the nominal membership fee of one dollar. There is no moral nor intellectual prerequisite required for membership in the respondent club. It was the duty of the respondent to adopt by-laws providing "for the admission of new members and how they shall be admitted, and prescribe their qualifications." [State v. Brawner, 15 Mo. App. 597.] The by-laws do provide how they shall be admitted and for expelling them, but do not fix any standard by

which to measure the qualifications of applicants, except that of the judgment of the membership committee and the board of directors. The law makes it the duty of the respondent to do this, and not the board of directors or a committee. [Revised Statutes of 1909, section 3441.] The general manager was given a free hand, as shown by the minutes of the meeting of August 1st, above quoted, to stage *any athletic entertainment* for the amusement of the members *at any time without consulting other directors of the club*. The ease with which parties can become members of the respondent and the small fee charged therefor cannot be deemed sufficient to destroy the public character of these exhibitions. The opinion in the case of Commonwealth v. Mack, 73 N. E. 543, though dissimilar in some respects from the case at bar, when analyzed in the light of the makeshifts employed there and in this case, is an authority for our holding.

It is stated by one witness in this case that the respondent had a club room and some other conveniences for its members calculated to advance them in learning and otherwise, but it is clear from all of the testimony that these were simply accessories to the room that was first rented and occupied by the respondent and for which room it paid so much *for each exhibition.* After moving from that room the respondent located over a livery stable, without any equipments whatever for carrying out its purposes, other than placing in the center of the large room a ring designed and used solely for boxing and sparring exhibitions. Indeed, but little funds could be accumulated for equipments by means of the small membership fee, unless a very large per cent. of the public patronized the sparring exhibitions. Clearly boxing contests were intended to be and were the only objects the incorporators of the respondent club had in view when the authority was secured from the state to do business as a corporation, and that it has been guilty

of violating the criminal laws of the state from its very inception is apparent from what has been already said. To hold that a corporation of this character can continue to exist when attacked by the state in an. appropriate proceeding, as this is, we think would be making a mockery of Article 10, Chapter 33, Revised Statutes of 1909, and render it possible for corporations to be organized which might violate nearly all of the criminal laws of this State under the guise of a corporate franchise, and might permit corporations to exercise powers in this regard not possessed by individuals. Such, we think, should not be permitted by the courts of this State.

Even if we concede that these exhibitions were not conducted in such a manner as to make them public, and, therefore, not a violation of said sections 4679 and 4681, Revised Statutes 1909, we have suggested to our minds, but which it is not necessary for us to decide, that since the state has characterized this class of exhibitions it should not be held that it will become a party to authorizing such exhibitions to be given under the guise of a club, authorized thereto and incorporated therefor by the state, and thereby encourage and become a party privately to that which it will not permit to be done publicly.

Years ago (Session Acts of 1874, pp. 48, 49, now sections 4679 and 4681, Revised Statutes 1909) the Legislature declared the policy of this State by making it a felony to prize fight or to encourage the same, and also made it a misdemeanor to have public boxing and sparring exhibitions. "The very highest evidence of the public policy of any state is its statutory law." [Mooreshead v. United Railways Co., 203 Mo. 121, 165, 96 S. W. 261, 100 S. W. 611.]

It is not essential in this case to decide that these exhibitions given by the respondent are prize fights, although there may be ample authority therefor in such well considered cases as State v. Patton, 64 N. E.

850; Seville v. State, 15 L. R. A. 516; Commonwealth ex rel. v. McGovern, 66 L. R. A. 280; State v. Purtell, 56 Kas. 478, 33 Pac. 783, and People v. Taylor, 96 Mich. 596. Several definitions of a prize fight are found in the above cases. Most, or all of them, include the element of receiving a prize or reward by one or both contestants, though it is held that it is not essential that the winner receive a different or greater reward than the loser. It is apparent that the "championship" or honor and reputation of being the winner may be a sufficient prize. It may be true that the incentive of obtaining a prize or reward as the winner in such a contest was the principal factor in building up and developing the sport and accounts for the term applied to such contests. The inhibition of the law, however, is not so much against the giving of a prize or reward for such contests as against the kind of fights which had been developed by giving prizes and which the lawmakers found were being conducted under the name of prize fights. Nor does the fact that certain "rules" have been enacted and are observed in such contests, tending to make the same less dangerous to life and limb and to lessen the pain and physical injury to the combatants, prevent such contests from being prize fights. It seems to us that while there are other elements and characteristics of a prize fight, such as the law seeks to prohibit, of more or less importance, that the essential element is the prearranged fighting, under certain rules, of two persons by striking each other with their fists and hands for the purpose and with the intent to inflict on each other such physical pain or injury as to disable his adversary from further continuing the contest. The fact that the fight may be stopped by a referee before an actual "knock-out," when it has progressed long enough and with such results that there is no longer a doubt as to which will disable the other, would make little difference as to the kind of fight. Nor should it make

much difference that it be agreed that in case one party succeeded in disabling his adversary in, say, ten rounds, that is, forty to fifty minutes of fighting with short rest periods, that the fight then cease, or if neither is disabled within that time, the victor be determined by which has inflicted the most punishment or nearest disabled his adversary.

We shall go no further in this case to defeat the exercise of power claimed ,by respondent under the second paragraph of the purposes stated in its articles of incorporation than to hold that it has been guilty of violating the statutes prohibiting public boxing and sparring exhibitions, and that no such power has been nor can be conferred upon it. State ex inf. v. Delmar Jockey Club, 200 Mo. 34, 92 S. W. 185, 98 S. W. 539; State ex inf. Rose Hill Pastime Athletic Club, 121 Mo. App. 81, 97 S. W. 978; State ex inf. v. Kirkwood Social Athletic Club, 121 Mo. App. 87, 97 S. W. 980; and State ex inf. v. Meramec Rod & Gun Club, 121 Mo. App. 364, 98 S. W. 815, are all cases in which the principle here applied is announced. In all of those cases efforts were made to evade the dramshop law.

Our attention has been called by the respondent to section 9263, Revised Statutes of 1909, which. confers upon cities of the third class the power to license, regulate or suppress boxing and sparring exhibitions, but this cannot be held to supersede the general provision of section 4681, Revised Statutes of 1909, prohibiting such exhibitions. [Sec. 9582, R. S. 1909; Harrison v. State, 9 Mo. 530; City of St. Louis v. Meyer, 185 Mo. 583, 594, 84 S. W. 914; St. Louis v. World Publishing· Co., 227 Mo. 146, 151, 126 S. W. 1019; State ex rel. v. Berryman, 142 Mo. App. 373, 381, 127 S. W. 129.] "The mere grant of a power to a municipality, with no words clearly showing an intention to make such power exclusive, will not exclude the

general State law." [Gates v. Crandall, 123 Mo. App. 414, 417, 100 S. W. 51.]

It is ordered that the judgment of this court be entered ousting the respondent of all of its franchise and charter grants and that the same be forfeited to the State, the corporation dissolved and the costs of this proceeding taxed against the respondent. *Sturgis, J.,* concurs. *Farrington, J.* concurs in the result in a separate opinion.

## CONCURRING OPINION.

FARRINGTON, J.—The prosecuting attorney of Greene county instituted this proceeding by *quo warranto* in this court against the respondent which is a corporation organized and existing under Chapter 33, Article X, Revised Statutes of 1909, alleging, among other things (which I do not deem it necessary to discuss), that respondent was voilating section 4681, Revised Statutes of 1909, which is as follows: "*Sparring and boxing.*—Any person who shall engage in any public sparring or boxing exhibition, or who shall aid, abet or assist in such exhibition, or who shall furnish any room or other place for such exhibition, shall be deemed guilty of a misdemeanor." Relator asks that respondent be ousted of its franchise and corporate privileges and that the same be declared forfeited.

The respondent admits that sparring and boxing exhibitions were engaged in and carried on under its auspices, but denies that such exhibitions were *public.* The question, therefore, for our determination is, whether under the evidence adduced, the five exhibitions which were admittedly given before the members of the club were *public* sparring or boxing exhibitions such as are condemned by the statute.

The evidence shows that the participants in the exhibitions were all expert, professional boxers re-

siding in various places in the United States, and brought here by the manager of this club and paid for their performance out of the gate receipts taken in by the manager from the members of the club who would buy tickets and attend the performance. To become a member of the club (honorary members excepted), it is necessary to make a written application, giving name and address, and tender the same together with an entrance fee of one dollar, and to agree to be subjected to the payment of assessments for benefits that might be collected from those who attended the exhibitions. The by-laws provide that any athletic member actually participating in an exhibition is exempt from the assessment for that exhibition. The application, under the by-laws, is to be passed upon by a membership committee composed of three club members who are directors, and if they approve, the applicant is then voted into the club provided he receives a sufficient number of votes in the board of directors.

This club manifested a remarkable growth in numbers. Starting with fourteen charter members, in less than six months it shows a membership of five hundred and twenty-three. The record shows that all applications were passed upon favorably by the membership committee, except six who failed to sign the application and two who failed to accompany the application with the entrance fee of one dollar. The minutes show that the last directors' meeting was held on August 30, 1913. The manager testified that the membership committee has held several meetings since then but that no record had been kept of the same. Of the five hundred and twenty-three members, the record shows that the board of directors, consisting of nine club members, voted into the club, only three hundred and sixty-one, the remaining one hundred and sixty-two obtaining their privilege of viewing the exhibitions by the mere approval of the mem-

bership committee and payment to the manager of the entrance fee of one dollar. After becoming a member, one must then pay the imposed assessment of one or two dollars per exhibition if he is a spectator. If he has a ringside seat, he pays an assessment to the club of two dollars for that particular performance, whereas if he sat elsewhere in the room he paid an assessment of one dollar. The minutes of the several meetings of the board of directors do not show who were present, nor indeed whether or not a quorum was there. At the first and only business meeting of the members at large of the club, which was held on August 1, 1913, the minutes show there was a quorum present. At this time the membership was confined to fourteen persons. At this meeting, among other officers elected was a vice-president and general manager. This person was authorized by the quorum of that meeting to serve one year and for a longer period provided a successor was not elected, and was authorized to stage any athletic entertainment for the amusement of the members without aid or counsel or advise or approval of the board of directors. He was also to receive all money taken in by the club and was to bear all the expenses incident to the operation of the club and pay himself out of the club's funds a salary of one hundred dollars per month if that much was netted, and if there was not enough in the fund to pay his salary he was to have whatever there happened to be. The possible membership of the club seems to be unlimited in number since the manager testifies it is the intention of the club to open a new book when the membership reaches one thousand. The by-laws provide that at any regular or called meeting of the full membership of the club, five meeting together shall constitute a quorum. When the club was first organized, it rented a place in which to hold its sparring exhibitions where there was a reading room, bathrooms, and a gymnasium for mem-

bers, but some time before this proceeding was insti-
tuted, the club changed the location of its sparring
arena to the loft of a barn, where, according to the
evidence, aside from the arena and the seats, there
seems to have been scanty furnishings or athletic
equipment. The evidence conclusively shows that the
corporation did not expect to make any money out of
its operations for the benefit of the membership at
large. The only money ever paid to the members
at large was a refund of assessments paid by some
for reserved seats because Eddie Lennon, a boxer, re-
fused to perform for the reason that the ring was too
small. The testimony shows that before a sparring
match would take place, it was advertised by placards
as well as newspaper notices, and that at times there
would be an attendance of from three hundred to three
hundred and fifty members, armed with their entrance
certificates which cost one dollar, who paid for their
seats. The club exacted no dues, except the price of
a seat to see an exhibition.

Enough has been shown to lead to but one con-
clusion and that is that the sparring exhibitions given
under the auspices of this club were accessible to all
who cared to witness them and who were able to sign
their name to an application and could raise the small
amount of money required. This constituted the ex-
hibitions in law and in fact *public sparring and boxing
exhibitions*, and hence unlawful. Counsel for respond-
ent touch this phase of the case but lightly, citing no
case to uphold their most postive assertion that the
exhibitions were not *public*. They do quote the vener-
able Webster's definition of the word "public," but
on examination we find that counsel have given us
the definition of the *noun* and not that of the *adjective*,
and that the adjective is defined as "opposed to pri-
vate." It will therefore be hard to reconcile the action
of the club in advertising the exhibitions some time
prior to the date on which they were to occur by

placards and newspaper notices for this course certainly would not tend to secrecy. Other definitions are given by law writers. Greenleaf on Evidence (16th ed.), sec. 128, has this to say: "The terms 'public' and 'general' are sometimes used synonymous, meaning merely that which concerns a multitude of persons." The word "public" is defined in the case of State v. Luce (Del.), 32 Atl. 1076, in this way: "The term 'public' does not mean all the people, nor most of the people, nor very many of the people of a place; but so many of them as contradistinguishes them from a few." In Commonwealth v. Quinn (Mass.), 40 N. E. 1043, it is held that a dance hall, to which the public is admitted on payment of a small fee, is a "public amusement" under the statute of Massachusetts providing that whoever carries on any public show, amusement, or exhibition without a license shall be fined. The case of Commonwealth v. Mack (Mass.), 73 N. E. 534, is parallel to the one at bar, and it was held that a club organized such as this, which required its members to sign an application and to be subjected to the payment of an assessment to witness exhibitions, was in violation of a statute prohibiting public boxing matches; and though that case is directly in point and is cited in relator's brief, it has called forth no criticism in respondent's brief and in fact is not mentioned.

The entire record shows that this club was managed in such a way as to throw open to public view sparring and boxing exhibitions, not only to the citizens of this commonwealth but to those of sister States as well. The restrictions or limitations, ostensibly designed to insure privacy and secrecy, were in fact designed and used for the purpose of making the exhibitions public and at the same time raising a sufficient amount of money from the public to pay the principals in the contests, the running expenses of the club, and the manager's salary. Under the evidence,

it was as easy for the public to view these exhibitions as it is to view any theatrical performance, circus, or show. The right to ride in a street car has some restrictions and the car is not open to the public who have not the fare, but such restriction makes it none the less a public conveyance. And so, where an exhibition is made so easily accessible to those desiring to attend as the evidence here discloses, the conclusion is at once reached that it is *public*. As was held in the cases of State ex inf. Hadley v. Rose Hill P. A. Club, 121 Mo. App. 81, 97 S. W. 978; State ex inf. Hadley v. Kirkwood S. A. Club, 121 Mo. App. 87, 97 S. W. 980; and State ex inf. Hadley v. Meramec R. & G. Club, 121 Mo. App. 364, 98 S. W. 815, when the court finds that the purpose and policy of a club is to evade the law and that it is being operated in direct conflict with the statute hereinbefore quoted, it becomes the plain duty of the court to dissolve the corporation and declare its franchise forfeited.

For the reasons herein appearing, and these only, I concur in the result reached in the majority opinion.